PAUL R. GLASSMAN (State Bar No. 76536)
LAURA L. BUCHANAN (State Bar No. 156261)
KATHLEEN D. DeVANEY (Sate Bar No. 156444)
STRADLING YOCCA CARLSON & RAUTH
A Professional Corporation
100 Wilshire Blvd., Suite 440
Santa Monica, CA 90401
Telephone: (424) 214-7000
Facsimile: (424) 214-7010
E-mail: pglassman@sycr.com
        lbuchanan@sycr.com
        kdevaney@sycr.com

JAMES F. PENMAN (State Bar No. 91761)
OFFICE OF THE CITY ATTORNEY
300 N. "D" STREET, Sixth Floor
San Bernardino, CA 92418
Telephone: (909) 384-5355
Facsimile: (909) 384-5238
E-mail: Penman_Ja@sbcity.org

Attorneys for Debtor
City of San Bernardino

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### RIVERSIDE DIVISION

| In re: | Case No. 6:12-bk-28006-MJ |
|---|---|
| CITY OF SAN BERNARDINO, CALIFORNIA, | Chapter 9 |
| Debtor. | **CITY OF SAN BERNARDINO'S MEMORANDUM OF FACTS AND LAW IN SUPPORT OF THE STATEMENT OF QUALIFICATIONS UNDER SECTION 109(C) OF THE BANKRUPTCY CODE** |

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

# TABLE OF CONTENTS

**Page**

Table of Contents

Page

I.    BRIEF INTRODUCTION ...................................................................................1

II.    STATEMENT OF FACTS ..................................................................................2

    A.    The City's Discovery Of Its Liquidity Crisis And Massive Budget Deficit,
       And The Events Leading To The Filing of the Petition. ...................................2

        1.    The City Was Not Aware Of Its Liquidity Crisis And Staggering
             Budget Deficit Until Late June Of 2012. .....................................3

        2.    The City Declared A Fiscal Emergency and Authorized The Filing
             of A Bankruptcy Petition. .............................................................5

        3.    The City Adopted A Fiscal Emergency Operating Plan And Had
             No Viable And Expedient Way To Solve Its Growing Liquidity
             Crisis And Budget Deficit. ...........................................................6

        4.    The City Filed Its Chapter 9 Petition. .........................................8

    B.    The Factors Underlying The City's Financial Difficulties. ...............................9

        1.    The City's General Fund Revenues Have Declined For Years. ...............10

             a.    Secured Property Tax Revenue Has Dropped Significantly. ..........10

             b.    Sales Tax Revenue Has Declined With High
                 Unemployment And Low Per Capita Incomes. .............................11

             c.    Declines In Other General Fund Revenue Streams And The
                 Loss Of Redevelopment Agency Funds. ......................................11

        2.    Cost Cutting Efforts Failed To Offset Increases In Expenditures. ...........12

             a.    The City's Efforts To Reduce Personnel Costs. ...........................12

             b.    The City's Unsecured Pension Costs And Unfunded
                 Pension Liabilities. ......................................................................14

             c.    The City's Unfunded OPEB Liabilities. .......................................15

             d.    The City's Unfunded Long Term Liabilities In Internal
                 Service Funds. .............................................................................15

             e.    Debt Obligations Burden The General Fund. ...............................16

        3.    Service Reductions Have Harmed The Community. ................................16

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

III.   THE CITY IS AN ELIGIBLE DEBTOR UNDER CHAPTER 9 OF THE
       BANKRUPTCY CODE..................................................................................17

       A.   The City Is A Municipality Under Section 109(c)(1)............................19

       B.   California Law Authorizes The City To File Its Petition As Required By
            Section 109(c)(2). ................................................................................19

       C.   The City Meets The Insolvency Requirement Of Section 109(c)(3)..................21

            1.   The Legal Standard For Insolvency.........................................22

            2.   The City Was Insolvent On The Petition Date Because It Generally
                 Did Not Pay All of Its Bona Fide Debts When Due. ................................23

            3.   The City Was Insolvent On The Petition Date Because It Was
                 Unable And Would Be Unable to Pay Its Debts As They Became
                 Due In Its Current Fiscal Year. .............................................24

            4.   The City's Revenue And Expenditure Projections Demonstrate
                 That The City Is Cash Flow Insolvent In Its Current Fiscal Year. ...........25

                 a.   The City's Revenues Will Be Essentially Flat...............................25

                 b.   The City's Distressed Financial Condition Prevented It
                      From Borrowing From The Private Credit Markets. ...................26

                 c.   The City Could Not Raise Revenues Fast Enough To Close
                      Its Projected $45.8 Million Budget Gap Or Solve Its
                      Liquidity Crisis. ...........................................................27

                 d.   The City Could Not Make Enough Cuts To Close Its $45.8
                      Million Budget Gap Without Endangering The Health,
                      Safety Or Well-Being Of The City's Residents And
                      Businesses. ................................................................28

       D.   The City Satisfies Section 109(c) (4) Because It Desires To Effect A Plan
            To Adjust Its Debts. ............................................................29

       E.   The City Has Satisfied Section 109(c)(5)(C)........................................30

            1.   Negotiations With All Of The City's Creditors Was Impracticable..........31

            2.   The City Reasonably Believed That A Creditor May Attempt To
                 Obtain An Avoidable Transfer...................................................34

       F.   The City Filed Its Petition In Good Faith. ...........................................35

IV.    CONCLUSION............................................................................38

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-ii-

TABLE OF CONTENTS

1

## TABLE OF AUTHORITIES

2

Page(s)

3

## FEDERAL CASES

4

*In re Boise County,*
  465 B.R. 156 (Bankr. D. Idaho 2011) ...........................................................31, 34

5

*Caruso Enterprise, Inc. v. U.S.A. Motel Corp. (In re U.S.A. Motel Corp.),*
  450 F.2d 499 (9th Cir. 1971) ..................................................................................24

6

7

*In re City of Bridgeport,*
  129 B.R. 332 (D. Conn. 1991) ...................................................................... *passim*

8

*In re City of Stockton,*
  2012 Bankr. LEXIS 3234 (Bankr. E.D. Cal. July 13, 2012) ...........................18, 19

9

*In re Connector 2000 Association,*
  447 B.R. 752 (Bankr. D.S.C. 2011) ........................................................................31

10

11

*In re County of Orange,*
  183 B.R. 594 (Bankr. C.D. Cal. 1995) ........................................................... *passim*

12

*International Association of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo),*
  408 B.R. 280 (B.A.P. 9th Cir. 2009) .............................................................. *passim*

13

14

*In re New York City Off-Track Betting Corp.,*
  427 B.R. 256 (Bankr. S.D.N.Y. 2010)("*NYC OTB*")............................29, 33, 34, 35

15

16

*In re Pierce Cnty. Housing Authority,*
  414 B.R. 702 (Bankr. W.D. Wash. 2009) .........................................24, 33, 35, 36

17

*Spain v. Mountanos,*
  690 F.2d 742 (9th Cir. 1982) ............................................................................9, 35

18

19

*In re Sullivan County Regional Refuse Disposal District,*
  165 B.R. 60 (Bankr. D.N.H. 1994) ..................................................................29, 35

20

*United States ex rel. Farmers Home Admin. v. Arnold & Baker Farms (In re Arnold & Baker Farms),*
  177 B.R. 648 (B.A.P. 9th Cir. Ariz. 1994) ...........................................................19

21

22

*In re Valley Health System,*
  383 B.R. 156 (Bankr. C.D. Cal. 2008)........................................................... *passim*

23

24

*In re Villages at Castle Rock Metropolitan District Number 4,*
  145 B.R. 76 (Bankr. D. Colo. 1990) .......................................................................31

25

26

*In re Winship,*
  397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970).........................................19

27

28

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-iii-

TABLE OF AUTHORITIES

DOCSOC/1574235v10/200430-0003

**STATE CASES**

*Barkley v. City of Blue Lake,*
    47 Cal. App. 4th 309 (1996) ...................................................................................26

*Cal. Building Industrial Association v. Governing Board,*
    206 Cal. App. 3d 212 (1988) ..................................................................................28

*Candid Enterprises v. Grossmont Union High Sch. District,*
    39 Cal. 3d 878 (1985) ............................................................................................28

**DOCKETED CASES**

*Cedric May Sr. et al v. City of San Bernardino et al.,*
    USDC No. 5:10-cv-00978-VAP-DTB .......................................................................8

*J. A. et al v. City of San Bernardino et al.,*
    USDC No. 5:09-cv-01388-JLQ-JC ...........................................................................8

*Estate of Terry Nash et al. v. City of San Bernardino et al.,*
    USDC No. 2:09-cv-08671-RGK -FFM ......................................................................8

**FEDERAL STATUTES**

11 U.S.C. § 101(32)(C)(i) ...........................................................................................22, 23

11 U.S.C. § 101(32)(C)(ii) ..........................................................................................22, 23

11 U.S.C. § 101(40) ..........................................................................................................19

11 U.S.C. §109(c) ........................................................................................................ *passim*

11 U.S.C. § 921(c) .............................................................................................................35

**STATE STATUTES**

Cal. Const., art. XVI, § 18 ...............................................................................................29

Cal. Govt. Code § 53760 ............................................................................................19, 20

Cal. Govt. Code § 53760.5 ................................................................................................20

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-iv-

TABLE OF AUTHORITIES

1      The City of San Bernardino, California (the "City" or "San Bernardino") submits this

2  Memorandum of Facts and Law in support of its Statement of Qualifications Under Section

3  109(c) of the Bankruptcy Code.

4  **I.    BRIEF INTRODUCTION**

5      The City filed its voluntary petition ("Petition") on August 1, 2012 ("Petition Date") on

6  an emergency basis seeking protection under Chapter 9 of the Bankruptcy Code because it faced

7  an immediate and dire liquidity crisis and was on the brink of a fiscal collapse.  Two weeks prior

8  to the Petition Date, the City declared a fiscal emergency after learning in late June of 2012 that

9  the City faced insolvency because of a *negative* $18.2 million beginning cash deficit in its

10  General Fund and a preliminarily projected $45.8 million budget deficit for its current fiscal

11  year.  This financial fiasco was even worse because, among other things, the City had no General

12  Fund or other reserves, and had no ability to access the short-term credit markets.  It had lost its

13  line of credit, its vendors were demanding cash payments before providing essential materials,

14  good and services, and City employees were retiring at an abnormally high rate, triggering

15  obligations for cash out payments of accrued vacation and sick leave.  The City faced a severe

16  cash crunch and was unable to pay all of its financial obligations, including its August payroll

17  obligation.  In short, the City was fast approaching the edge of a massive fiscal cliff with no

18  viable way to raise revenue and cut spending fast enough to avoid falling off the edge.

19      Confronted with this unfortunate reality, the City took prompt action to provide enough

20  liquidity to operate and provide essential services for the health, safety and well-being of its

21  citizenry through September 2012 by approving a fiscal emergency operating plan on July 24,

22  2012.  While the fiscal emergency operating plan was in place, the City anticipated filing its

23  Petition and preparing a pendency plan that would serve as a basis for a long term plan of

24  adjustment of its debts which, under the oversight of this Court, would rebuild San Bernardino's

25  financial structure on a sound and economically resilient foundation.  Despite the City's efforts,

26  certain creditor actions threatened to exacerbate the City's liquidity crisis and endanger the

27  City's ability to provide essential services to its residents.  The City had no choice but to seek

28  emergency bankruptcy protection under Chapter 9 as a last resort.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-1-

MEMORANDUM OF FACT AND LAW

DOCSOC/1574235v10/200430-0003

1   **II.     STATEMENT OF FACTS**

2          The City certified that it satisfies each of the five eligibility criteria of 11 U.S.C. §109(c)

3   and that it filed its Petition in good faith in its Statement of Qualifications Under Section 109(c)

4   ("Qualifications Statement").[1]   As a prefatory matter, while the City certainly was aware prior to

5   late June 2012 that City revenues had declined during the Great Recession and the City was

6   struggling financially, the City believed that it had taken steps to reduce expenditures in an effort

7   to address budgetary issues appropriately.   Only after an analysis of the City's financial

8   condition was completed in late June of 2012 did the City discover that it was on the edge of a

9   very deep fiscal abyss.   As set forth below, the City first explains the events that led to the late

10  discovery of the City's current cash flow and financial crisis and the emergency filing of its

11  Petition, and then discusses in detail the economic factors that caused the City's structural budget

12  imbalance and the magnitude of its distressed financial condition.

13         A.      **The City's Discovery Of Its Liquidity Crisis And Massive Budget Deficit,**

14                 **And The Events Leading To The Filing of the Petition.**

15         Several factors led to the late discovery of the scope and extent of the financial problems

16  that burden the City.   Beginning in late 2011 and continuing through early May of 2012, key

17  City management personnel retired or resigned. *See*, Declaration of Andrea M. Travis-Miller

18  ("Travis-Miller Dec."), ¶5.   The City's former Director of Finance retired at the end of December

19  2011. *Id*.   The former City Manager resigned effective May 1, 2012. *Id*.   As late as April of

20  2012, the former City Manager believed that the City's estimated budget shortfall for fiscal year

21  2011-12 would be just over $3.1 million which the City believed could be remedied by

22  additional cuts to department budgets, continuing a hiring freeze on filling vacant positions and

23  making revenue adjustments. *Id*.   As the City discovered in late June 2012, in actuality its

24  financial condition was far worse.

25

26

27

28

---

[1] The City will submit an Amended Statement of Qualifications which states an additional and alternative ground for eligibility under 11 U.S.C. §109(c)(5)(D) with this Memorandum.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-2-

MEMORANDUM OF FACT AND LAW
DOCSOC/1574235v10/200430-0003

1      **1.      The City Was Not Aware Of Its Liquidity Crisis And Staggering**

2      **Budget Deficit Until Late June Of 2012.**

3          Beginning in May, 2012, the City's new Director of Finance ("Finance Director") began

4  the process of analyzing the City's financial condition and developing a budget for the 2012-13

5  fiscal year.[2] *See*, Declaration of Jason P. Simpson ("Simpson Dec.") at ¶6.  The Finance Director

6  discovered that the monthly reconciliation of the bank statements for the City's bank accounts to

7  the City's General Fund[3] ledgers had not been done since June 30, 2011 and was nine months

8  behind schedule, and that the audit for fiscal year 2010-11 had not been completed.[4] *Id*.  The

9  Finance Director also began to analyze the status of the City's General Fund and other reserves,

10 the City's budgets from fiscal year 2007-08 through 2011-12 and the City's revenue streams. *Id*.

11 Completing this financial analysis and remedying the backlog of bank reconciliations and other

12 accounting tasks took roughly seven weeks, and resulted in a report by the City's Finance

13 Department entitled "San Bernardino Budgetary Analysis and Recommendations for Budget

14 Stabilization" dated July 9, 2012 (the "Budget Report"). *Id*. *See*, Ex. B to Declaration of

15 Georgeann Hanna ("Hanna Dec.").

16         The salient points of the Budget Report include: (1) the City faced a budget deficit

17 preliminarily estimated to be over $45.8 million in its current fiscal year;[5] (2) the City had

18 depleted all of its General Fund reserves and reserves in its internal service fund accounts and

19 other funds to cover substantial budget deficits in the last four consecutive fiscal years; (3)

20 immediate and substantial action had to be taken to reduce spending and preserve cash for the

21 City to continue to provide essential services to the City's residents; (4) reviews of the City's

22

23 [2] The City's current fiscal year began on July 1, 2012.
   [3] The General Fund accounts for most municipal services such as police, fire, public works, administrative services,
24 recreation, and cultural programs. Simpson Dec., ¶7.  Revenues of the General Fund may be spent on any legal
   municipal purpose.  Under generally accepted accounting principles, municipalities account for their activities in
25 separate funds to segregate resources by source and purpose and to permit a reporting process that clearly identifies
   the financial activities of each of the funds and demonstrates compliance with restrictions that are placed on many of
26 the City's revenue streams. *Id*.  Also, federal, state, and private grants may contain requirements that restrict how
   grant monies may be spent. *Id*.
27 [4] The backlog of work in the Finance Department was caused, in part, by implementation of a new City-wide
   financial accounting software system from New World Systems to replace the City's antiquated 15 year old system.
28 [5] The City's projected $45.8 million current fiscal year budget deficit is a preliminary estimate that was formulated
   in June of 2012 just prior to the July 1 start of the City's current fiscal year.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-3-

MEMORANDUM OF FACT AND LAW

1  General Fund revealed that the balances at the start of the 2010-11 and 2011-12[6] fiscal years had

2  been erroneously reported by City staff and actually totaled over $4.5 million *less* than reported,[7]

3  and that the beginning General Fund balance for the current fiscal year was estimated to be a

4  cash *deficit* of over $18.2 million;[8] and (5) the City did not have enough unrestricted cash or any

5  reserves available to pay its financial obligations as and when those obligations were due or to

6  become due beginning in July of 2012 and continuing through the remainder of the current fiscal

7  year and beyond. *See*, Declaration of Michael Busch ("Busch Dec."), ¶13; Simpson Dec., ¶17.

8  *See,* Ex. B to Hanna Dec.

9  　　　　Perhaps even more dire than the City's enormous financial hole was the fact that the City

10  faced a severe liquidity crisis.  As news of the City's financial problems spread, its fiscal

11  situation and cash flow crisis[9] grew worse.  A Staff Report dated July 18, 2012 ("Staff Report")

12  prepared to supplement the Budget Report explained that: (1) it was likely that the City could not

13  meet its payroll and other financial obligations in the next 30 to 60 days, including debt

14  obligations and lease payments for critical City assets; (2) an unusually large number of

15  employees were retiring and leaving the City triggering immediate cash outs of vacation and sick

16  leave accruals; (3) the City's credit line had been terminated; (4) vendors were demanding cash

17  up front before providing essential materials, goods and services to the City; (5) the City had no

18  ability to access short term credit markets to solve its cash flow problems and no reserves; and

19  (6) cash flow projections showed that the City had monthly General Fund deficits ranging

---

[6] The City estimates that the budget deficit before transfers for fiscal year 2011-12 was an estimated $19.8 million and $9,394,987 after transfers.  The failure to timely reconcile the City's bank statements to the City's General Ledger and timely complete the 2010-11 fiscal year audit taken together with the massive budget deficit in the 2011-12 fiscal year helps explain why the City faced a deep fiscal cliff when these issues were first discovered in late June 2012.

[7] More specifically, the financial audit required the City to restate its General Fund starting balances for the last three fiscal years.  For fiscal year 2010-11, the balance was restated downward from approximately $1,770,400 to $410,293, a negative adjustment of roughly $1.36 million.  The situation was even worse for 2011-12.  The General Fund starting balance for fiscal year 2011-12 needed to be restated from a positive $2,044,100 to a negative $1,181,603, a reduction of about $3.2 million, for a total downward adjustment of $4,585,810 in the last two fiscal years alone. Simpson Dec., ¶18.

[8] The City's General Fund starting balance for fiscal year 2012-13 is estimated to be a negative cash deficit of $18,292,229.

[9] The City's available cash in the General Fund reached a negative fund balance of $18.5 million and as low as about $150,000 citywide including the restricted or committed special funds separate from the General Fund. Simpson Dec, ¶19.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-4-
MEMORANDUM OF FACT AND LAW
DOCSOC/1574235v10/200430-0003

1  between about $2 and $5.6 million from July through September. Simpson Dec., ¶20; Busch

2  Dec., ¶15. *See,* Ex. I to the Hanna Dec.

3          **2.          The City Declared A Fiscal Emergency and Authorized The Filing of**

4                  **A Bankruptcy Petition.**

5          Facing an immediate liquidity crisis and the fact that the City was or would be unable to

6  meets its financial obligations, City staff recommended that the City consider a declaration of

7  fiscal emergency and filing for Chapter 9 bankruptcy protection.  Travis-Miller Dec., ¶7.  Thus,

8  the City placed on the July 10, 2012 agenda of a noticed meeting of the Mayor and Common

9  Council that there would be a discussion on the City's budget for the fiscal year 2012/2013 and

10  taking possible action on authorizing the filing of a petition under Chapter 9, and such meeting

11  was open for public comments.[10] *See*, Ex. D to Hanna Dec.  The Budget Report was presented to

12  the Mayor and Common Council at that meeting. Busch Dec., ¶13; Travis-Miller Dec., ¶8;

13  Simpson Dec. ¶17.

14          After further consideration of the Budget Report, the City placed on the agenda of the

15  July 16, 2012 noticed meeting of the Mayor and Common Council that there would be a

16  discussion concerning a declaration of fiscal emergency in the City and authorization to file a

17  Chapter 9 petition. Travis-Miller Dec., ¶9; *See*, Ex. E to Hanna Dec.  Following discussions and

18  public comments at the July 16 meeting, that meeting was adjourned and continued to July 18,

19  2012. *Id.*; *See*, Ex. F to Hanna Dec.  For a third time, the City's fiscal emergency and

20  consideration of Chapter 9 bankruptcy was on the agenda of the July 18 meeting, and the Staff

21  Report was presented to the Mayor and Common Council at that time. *Id.*; *See*, Ex. F to Hanna

22  Dec.

23          Following the presentations, discussions and public comments at the three noticed

24  meetings held on July 10, July 16 and July 18, a majority of the members of the Common

25  Council voted to declare a fiscal emergency and passed resolution No. 2012-205. finding that:

26  (1) the City is or will be unable to pay its obligations within the next 60 days, and that the

27

28

---

[10] The Budget Report was made available to the public on the City's website on July 9, 2012. Travis-Miller Dec., ¶ 9.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-5-

MEMORANDUM OF FACT AND LAW

DOCSOC/1574235v10/200430-0003

1   financial state of the City jeopardizes the health, safety or well-being of the residents of the City

2   absent the protections of Chapter 9; and (2) given the City's dire financial condition, it was in the

3   best interest of the City to declare a fiscal emergency. Travis-Miller Dec., ¶10; *See*, Ex. G to

4   Hanna Dec.  The City's dire cash flow crunch presented a fiscal emergency that translated into a

5   service emergency and would negatively affect the health, safety and well-being of its citizens if

6   City employees, including police, fire and other essential workers, were not paid and did not

7   report for work. Simpson Dec., ¶19; Busch Dec., ¶14.  On July 18, 2012, the Mayor and

8   Common Council also determined that "given the City's dire financial condition and taking into

9   consideration the advice of City staff and counsel, it was in the best interests of the City to seek

10  protection under Chapter 9 of the Bankruptcy Code" and Resolution No. 2012-206 passed

11  authorizing the filing of a voluntary petition under Chapter 9 of the Bankruptcy Code. Travis-

12  Miller Dec., ¶10; *See*, Ex. H to Hanna Dec.

13              **3.       The City Adopted A Fiscal Emergency Operating Plan And Had No**

14                      **Viable And Expedient Way To Solve Its Growing Liquidity Crisis**

15                      **And Budget Deficit.**

16          After the City's declaration of fiscal emergency, reports entitled "Fiscal Emergency

17  Operating Plan – July 2012 to September 2012" (the "Fiscal Emergency Plan") and "City of San

18  Bernardino Selected Monthly Cash Flow Analysis" ("Cash Flow Analysis") were presented at

19  the next meeting of the Common Council and Mayor on July 24, 2012. Simpson Dec., ¶21;

20  Travis-Miller Dec., ¶11; Busch Dec., ¶16; *See*, Exs. L and M to Hanna Dec.  The Cash Flow

21  Analysis demonstrated that the City had substantial net cash deficits in July, August and

22  September and, therefore, could not pay all of its obligations due and owing during those

23  months. *Id.*; *See*, Ex. M to Hanna Dec.  Thus, in order to preserve enough cash to meet its

24  August payroll obligations and provide essential services through the end of September assuming

25  that a Chapter 9 case would be filed, the City approved the Fiscal Emergency Plan on July 24,

26  2012. *See*, Ex. N to Hanna Dec.  Pursuant to that Fiscal Emergency Plan, the City did not make

27  payments for: (1) debt payments due, including a payment for pension bond obligations due on

28  July 20, 2012 in the amount of over $3.3 million, (2) bi-monthly payments to fund retiree health

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-6-

MEMORANDUM OF FACT AND LAW

DOCSOC/1574235v10/200430-0003

1    obligations due in the first quarter in the amount of $2,219,332, (3) deferred equipment

2    purchases and capital projects, (4) a payment due under a note for its financial accounting

3    software system in the amount of $645,000, and (5) other trade payables due and owing in an

4    amount of over $6 million. Simpson Dec., ¶25.  In addition, the City could not make payments

5    required by settlements in three lawsuits totaling $1,461,000 because of its liquidity crisis. *Id*.

6    The City also continued certain employee compensation concessions and took other measures to

7    preserve cash. *Id*., *See*, Ex. O to Hanna Dec.

8         As part of the Fiscal Emergency Plan, the City analyzed whether any viable expedient

9    solutions existed to cure its immediate liquidity crisis[11] and fill its deep financial hole consisting

10    of the General Fund beginning cash deficit and the current fiscal year budget deficit.[12]  Given the

11    magnitude of its financial problems, the City determined that it could not borrow money from the

12    private credit markets to meet its obligations because the City could not demonstrate the ability

13    to pay back any such loan with revenues generated in the current fiscal year. Simpson Dec., ¶23.

14    The City had depleted all of its reserves. *Id*.  With an increasingly deeper negative cash deficit in

15    the General Fund and a staggering budget deficit, a loan to the General Fund from a private

16    creditor may have created a debt that exceeded the City's available revenue for the fiscal year.

17         In addition, the City believed that practical issues and legal and accounting requirements

18    also limited the City's ability to raise or borrow money to close revenue shortfalls on an

19    expedited basis.  Proposition 13 limits property tax rates to 1%[13] of fair market value exclusive

20    of voter-approved bonded indebtedness. Busch Dec., ¶20.  Proposition 218 limits the City's

21    ability to raise any other taxes by requiring that a majority of voters approve any new or

22    increased general tax (the proceeds of which can be used for any purpose) and that a two-thirds

23    majority approve any new or increased special tax (one expressly limited to a specific purpose).

24

25    [11] Generally speaking, General Fund cash flow is sporadic. While personnel expenses are constant throughout the
year, revenue receipts vary widely. Simpson Dec., ¶7. For example, the City receives property tax revenues into the
26    General Fund in December and April. *Id*.  Other revenues such as sales tax and utility users tax may come into the
General Fund on a monthly basis, while the transient occupancy tax revenues may be received on a quarterly basis,
27    and business license taxes may be received on an annual basis. *Id*.
[12] From the end of June 2012, the City will end each month with a negative cash balance of millions of dollars in the
28    General Fund.
[13] The City receives approximately 18% (generally) of the 1% real property tax on the assessed value.

Stradling Yocca
Carlson & Rauth
Lawyers
Newport Beach
-7-
MEMORANDUM OF FACT AND LAW
DOCSOC/1574235v10/200430-0003

1   *Id*.  Locally, voters' enactment of Measure Z (a .25 percent district tax for 15 years enacted in

2   2006) to be used to fund more police officers and support personnel and anti-gang and anti-crime

3   operations, left the City with limited opportunities to create new general purpose revenue sources

4   on its citizens with limited incomes, a significant percentage of which live at the poverty level.

5   *Id*.  And, in any event, the immediate severity of the City's cash flow problems and time required

6   to enact a ballot measure ruled out a tax increase as a viable expedient option. *Id*.  The City's

7   severe cash flow crisis did not allow the City sufficient time to analyze whether any City owned

8   nonessential real property could be sold to raise one-time revenues, let alone complete the

9   process of liquidating such assets. *Id*.

### 4.      The City Filed Its Chapter 9 Petition.

11      Not unexpectedly, the City's financial condition deteriorated further after its distressed

12  financial condition became public knowledge, even after implementation of the Fiscal

13  Emergency Plan.  The City faced certain creditor actions ranging from declaring defaults on

14  certain obligations[14] to threats to levy on City assets.[15] *See*, Travis-Miller Dec., ¶12.  In

15  particular, the City's liquidity crisis was threatened by acts to collect payments required by

16  settlements in three federal district court lawsuits (collectively, the "Lawsuits").[16]  In the

17  Lawsuits, the City reached negotiated settlements,[17] two of which required court approval which

18  was obtained in June of 2012. *See*, Declaration of Arthur K. Cunningham ("Cunningham Dec."),

19  ¶¶ 3-5; Declaration of Joseph Arias ("Arias Dec."), ¶¶ 5-9.  When the City was unable to make

20  certain required settlement payments due to its liquidity crisis, the plaintiffs filed an *ex parte*

21  application in each case in mid July 2012 seeking Court orders to compel payment of $1,461,000

---

[14] The City was at considerable risk of losing critical assets necessary for the health, safety and welfare of its citizens because certain of its equipment leases for City assets such as police cars, fire trucks, and refuse vehicles contain clauses which define an event of default as an inability to pay debts when due and permit a creditor to repossess such equipment upon such event of default.

[15] One creditor even repossessed a copier using self-help.

[16] These cases are *J. A. et al v. City of San Bernardino et al.*, USDC No. 5:09-cv-01388-JLQ-JC; *Estate of Terry Nash et al. v. City of San Bernardino et al.*, USDC No. 2:09-cv-08671-RGK –FFM; and *Cedric May Sr. et al v. City of San Bernardino et al.*, USDC No. 5:10-cv-00978-VAP-DTB.

[17] The settlements were reached in December 2011, January 2012 and May of 2012 before the City discovered the scope and extent of its financial problems and liquidity crisis. *See*, Cunningham Dec. at ¶¶4-6 and Arias Dec. at ¶¶4-9.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-8-

MEMORANDUM OF FACT AND LAW
DOCSOC/1574235v10/200430-0003

1    within 24 hours. *See*, Cunningham Dec., ¶¶ 6-9 and Ex. A thereto; Arias Dec., ¶¶ 11-12 and Ex.

2    A thereto.

3        The City opposed the requests for orders to compel payment, and argued that: (1) the City

4    did not have sufficient funds available to make the settlement payments and any levy on its bank

5    account by means of a writ of execution threatened the health, safety and welfare of its residents;

6    and (2) payment of those claims would constitute preferences under Section 547 of the

7    Bankruptcy Code if a Chapter 9 case was filed. *Id.*  Orders were entered directing that judgments

8    be entered against the City, and the manner of execution was addressed in two of the cases.

9    Cunningham Dec., ¶ 10 and Ex. B thereto; Arias Dec., ¶ 13 and Ex. B and C thereto.  In one

10    case, the Court determined that the City could not use state law to prevent collection of a federal

11    civil rights judgment.[18]  *See*, Ex. B to Arias Dec.  Based on the Court's decision and plaintiffs

12    intention to obtain writs of execution on an emergency basis, the City reasonably believed that

13    plaintiffs could obtain such writs of execution permitting the plaintiffs to levy on the City's bank

14    account on an expedited basis and, as a result, the City would be unable to make its August

15    payroll obligations and vendor payments resulting in the inability to provide essential services to

16    its residents.  *See* Cunningham Dec., ¶ 11 and Ex. C thereto; Arias Dec., ¶ 17 and Ex. D thereto.

17    The next day, the City sought relief under Chapter 9 of the Bankruptcy Code by filing its Petition

18    on an emergency basis. [Docket No. 1].

19        **B.    The Factors Underlying The City's Financial Difficulties.**

20        In this section, the City explains its analysis of the causes of the City's fiscal problems

21    which was performed during the process of preparing the Budget Report between early May of

22    2012 and late June of 2012.  The City struggled with budget deficits for the past four consecutive

23    fiscal years. Simpson Dec., ¶8.  Since the end of fiscal year 2008-09, the City's General Fund

24    revenues dropped while its General Fund expenditures remained the same or increased. *Id.*  As a

25    result, the City's budget deficits in the last four consecutive fiscal years total about $26.7 million

26

27    _____
[18] In its opinion, the court *sua sponte* cited *Spain v. Mountanos*, 690 F.2d 742, 746 (9th Cir. 1982), which held that
the district court could order any remedy provided in Rule 69 or Rule 70 to enforce an award, including ordering
state officials to pay a claim where a state had not appropriated funds to pay a settled claim through the legislative
28    process. *See*, Ex. B. to Cunningham Dec.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-9-

MEMORANDUM OF FACT AND LAW
DOCSOC/1574235v10/200430-0003

1  as follows: (1) a $13.4 million deficit in fiscal year 2008-09; (2) a $2.3 million deficit in fiscal

2  year 2009-10; (3) a $1.6 million deficit in fiscal year 2010-11; and (4) an estimated $9.4 million

3  deficit for fiscal year 2011-12.[19] *Id.*

4       To close these past budget deficits, the City exhausted its General Fund reserves,

5  negotiated compensation reductions, cut jobs, cut services, sold assets, implemented revenue

6  measures, increased transfers from other funds, and used other mechanisms to maintain liquidity

7  and continue essential operations. Simpson Dec., ¶8.  Despite these efforts, the City faced a

8  projected operating shortfall preliminarily estimated to be over $45.8 million in its current fiscal

9  year which began on July 1, 2012, which amounts to almost 38% of the General Fund budget. *Id.*

10  The City's projected labor costs alone exceed the City's projected annual revenues in the current

11  fiscal year. *Id.,* ¶8.  The City's budget deficit is projected to grow only larger to approximately

12  $49 million each year for the next five fiscal years due to, among other things, continued

13  stagnation in General Fund revenues, the poor housing market and economy, increasing pension

14  and other post-retirement benefit costs, and unfunded liabilities in the City's retiree health,

15  worker's compensation and general liability accounts. *Id.,* ¶8.  Essentially, the City faces a

16  structural budget gap – its growth in recurring expenditures exceeds its revenue growth.

17           **1.      The City's General Fund Revenues Have Declined For Years.**

18       The Great Recession and housing bubble burst adversely affected San Bernardino just

19  like other cities in California and across the nation. Busch Dec., ¶ 6.  Since 2007, housing prices

20  plummeted and the foreclosure rate increased resulting in significantly lower property tax

21  revenues. *Id.*  Unemployment increased, per-capita incomes dropped and businesses closed

22  resulting in lower sales tax revenue.  Revenues from secured property and sales taxes alone

23  dropped between $10 million and $16 million annually over the last several years. Simpson Dec.,

24  ¶9.

25           **a.      Secured Property Tax Revenue Has Dropped Significantly.**

26       The housing construction boom of the early 2000's led to speculation in the housing

27  market and an influx of people moving to San Bernardino to seek more affordable housing than

28

---

[19] These amounts are the budget deficits after transfers in the last four consecutive fiscal years.

MEMORANDUM OF FACT AND LAW

1   that available in Los Angeles, Orange and San Diego Counties. Busch Dec.,¶ 6.  Speculation in

2   San Bernardino's housing market made it particularly vulnerable when the housing bubble burst,

3   and the Riverside-San Bernardino-Ontario metro area has one of the nation's highest foreclosure

4   rates. *Id.*  The median single family home sales price peaked in 2007, and remains over 40%

5   below that peak in June of 2012. *Id.*  San Bernardino's foreclosure rate is 3.5 times greater than

6   the national average.  In addition to declines in residential real estate prices, commercial

7   properties have dropped in value and continue to search for a bottom. *Id.*  The City estimates it

8   faces over $17 million of non-residential property tax appeals exposure. Simpson Dec., ¶9.

9   Since the 2008-09 fiscal year, property tax revenues dropped between approximately $4 million

10  and $7 million each year. *Id.*  Given continued housing market weakness and the constraints

11  imposed by Proposition 13 on property tax increases, property tax revenues likely will remain

12  flat for years to come.  Busch Dec., ¶6.

13              **b.**      **Sales Tax Revenue Has Declined With High Unemployment**

14                          **And Low Per Capita Incomes.**

15          The Great Recession caused job losses for many of San Bernardino's residents. Busch

16  Dec., ¶7.  Since June of 2008, the City has suffered from double digit unemployment. *Id.*  The

17  City's unemployment rate was 16.9% as of June 2012, which is notably higher than the State of

18  California's and more than double the June 2012 national rate of 8.2%. *Id.*  By 2010, roughly

19  34.6% of the City's population was classified as poor. *Id.*  In 2011, the U.S. Census Bureau

20  ranked the City as the second poorest in the nation behind only Detroit. *Id.*  Not surprisingly

21  given these statistics, sales tax revenue has declined significantly from its peak level of $36.7

22  million in 2005-06 to a low of $20.4 million in 2009-10 -- a decline of over $16 million or

23  44.4%. Simpson Dec., ¶9.  While sales tax revenues have increased modestly since the 2009-10

24  low, such revenues are not projected to return to peak levels in the near term.  Busch Dec., ¶7.

25              **c.**      **Declines In Other General Fund Revenue Streams And The**

26                          **Loss Of Redevelopment Agency Funds.**

27          In addition to declining real property and sales tax revenues, the City has suffered

28  essentially flat or lower revenues from franchise taxes, user utility taxes, business registration,

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-11-

MEMORANDUM OF FACT AND LAW

DOCSOC/1574235v10/200430-0003

1    licenses and permits, revenues from other agencies and other miscellaneous revenues from

2    sources such as fines, penalties and the transient occupancy tax. Simpson Dec., ¶ 10.  The loss of

3    redevelopment agency funds also negatively impacted the City's financial struggles. *Id.*  In 2011,

4    Governor Brown signed legislation eliminating redevelopment agencies throughout the State of

5    California.  In December of 2011, the California Supreme Court upheld this legislation and

6    ordered the dissolution of all redevelopment agencies effective as of February 1, 2012.  This

7    resulted in the loss of further resources to support economic development programs in the City

8    and funds allocated for general government functions.

9                    **2.      Cost Cutting Efforts Failed To Offset Increases In Expenditures.**

10         Despite San Bernardino's cost-cutting efforts, expenditures continued to exceed

11   revenues.  The City spent all of its General Fund reserves, sold assets, negotiated or imposed

12   employee concessions, cut jobs, left vacancies unfilled, cut funding to community services and

13   utilized other strategies to cover the huge budget gaps of the last four consecutive fiscal years

14   and maintain essential services. Simpson Dec. at ¶ 8.  The population growth and increase in

15   residential housing units during the housing boom resulted in a higher demand for City services

16   and added to the City's obligation to provide infrastructure support and essential public services

17   in a City that now sprawls over roughly 59.3 square miles.  Busch Dec., ¶8.  The City has been

18   unable to balance its budget despite the City's efforts to cut costs, and is overwhelmed with

19   financial obligations the General Fund can no longer afford to pay.

20                    **a.      The City's Efforts To Reduce Personnel Costs.**

21         Labor costs have been and are the City's largest General Fund expenditure. Simpson

22   Dec., ¶11.  Governmental service delivery is labor-intensive and relies on City employees to

23   patrol streets, respond to emergencies, provide services at libraries and community centers, and

24   deliver the other direct and supporting services to operate the City. Busch Dec., ¶8.  In fiscal year

25   2011-12, 72% of the General Fund budget was dedicated to public safety services provided by

26   the police and fire departments, with another 4% of the General Fund allocated to other

27   departments to support public safety functions. Simpson Dec., ¶11.  These expenses are paid

28   from the General Fund.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

                                             -12-

DOCSOC/1574235v10/200430-0003

1      Over the last few years, the City tried to balance its budgets by negotiating reductions in

2  employee costs, while continuing to provide essential services to the public and eliminating

3  certain City positions, all of which resulted in reductions in service levels to the community.

4  Travis Miller Dec., ¶13.  The City has eliminated over 250 positions during the last three years

5  and now has its lowest staffing level in many years despite population growth of nearly 25,000

6  people. *Id.*  The City successfully negotiated labor concessions with most City employees

7  resulting in savings of $10 million annually. *Id.*  The City could not reach any negotiated labor

8  concessions with the City's firefighters and, therefore, imposed unilateral concessions in an

9  effort to cut costs. Travis Miller Dec., ¶14.  In response, the San Bernardino Professional

10  Firefighters, Local 891 filed a lawsuit against the City and San Bernardino City Council

11  challenging the imposition of salary reductions and a change to the definition of overtime. *Id.*

12  The Firefighters were awarded a judgment of $1,400,000, which the City has appealed.[20] *Id.*

13      In the current fiscal year, public safety costs are projected to account for 69% of all

14  General Fund expenditures.  Simpson Dec., ¶11.  These expenditures alone are estimated to

15  account for close to $110,000,000.  *Id.*  San Bernardino's City Charter contains provisions that

16  establish the salaries for members of both the San Bernardino Police and Fire Departments and

17  mandates a process of determining such salaries based on the arithmetic average of the monthly

18  salaries paid in the top ten California cities with populations between 100,000 and 250,000. *Id.*

19  As such, under the City's Charter, the process of determining the amount of salaries paid to the

20  City's police and firefighters is independent of and unrelated to the fiscal condition of the City.

21      Despite the City's efforts to reduce personnel costs by negotiating concessions,

22  eliminating positions and leaving vacancies unfilled, the City's cost per employee has risen

23  steadily as retirement costs increase. Simpson Dec., ¶12.  This unfortunate fact has forced the

24  City to reduce staff and services in an effort to balance budgets without receiving any

25  corresponding reduction in its overall personnel costs.

26

27

28

---

[20] That lawsuit is entitled *San Bernardino City Firefighters, Local 891, Richard "Scott" Moss v. City of San Bernardino, et al.*, San Bernardino Superior Court Case No. CIVDS 1102415.

MEMORANDUM OF FACT AND LAW

b.     **The City's Unsecured Pension Costs And Unfunded Pension
Liabilities.**

The City participates in The California Public Employee Retirement System
("CalPERS"). Busch Dec., ¶9.  CalPERS is a state agency that manages retirement benefits for
public employees, retirees and their families. *Id*.  City employees participate in CalPERS, and the
City has little control over increasing CalPERS pension costs. *Id*. CalPERS pension costs are a
combination of an "employer" and "employee" share. *Id*.  CalPERS sets the employer share
depending on actuarial assumptions. *Id*.

CalPERS has set the City's employer share as 30% of compensation for public safety
employees and 17% for non-safety employees, and the employee share at 9% for public safety
and 8% for non-safety workers in the current fiscal year. Busch Dec., ¶10.  Historically, the City
paid both the employer and employee shares. *Id*.  Based on these numbers, the City's
contribution retirement rates as a percentage of payroll will be 39% for public safety employees,
and 25% for miscellaneous workers this fiscal year. *Id*. Through recent negotiations, the City
reached an agreement with its labor groups for new hires after October 2011 to pay the full
employee share, but this does not affect the City's obligation to pay the employee's share of the
CalPERS contribution for employees hired before October 2011. *Id*.

The City's employee retirement costs have more than tripled since 2000-01 for
miscellaneous employees and almost tripled for public safety workers. Busch Dec., ¶11.
Retirement costs are projected to be $19 million this fiscal year. *Id*.  In addition to the pension
plans, retirees receive an annual 2% cost of living adjustment (COLA) regardless of the
Consumer Price Index or the state of the retirement funds and other enhanced pension formula
benefits that increase the City's pension costs. *Id*.  The City's book value and market value of its
unfunded CalPERS liability is $143.3 million and $319.5 million, respectively, as of June 30,
2010.  The City's current fiscal year budget does not include any amounts for the City's
unfunded CalPERS liability. *Id*.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-14-
MEMORANDUM OF FACT AND LAW
DOCSOC/1574235v10/200430-0003

1              **c.**        **The City's Unfunded OPEB Liabilities.**

2            The City's retirement plans also provide for other post-employment benefits (OPEB)

3 consisting of retiree medical care. Busch Dec., ¶12.  Generally, City employees are eligible to

4 receive a financial contribution toward retiree medical insurance coverage after retirement from

5 public service. *Id*.  Because employees are eligible to retire at either age 50 (for police and fire)

6 or 55 (for other employees) before such employees are eligible for Medicare, the City's costs for

7 this benefit are significant. *Id*.  Unlike pension benefits which are traditionally funded through

8 the working life of the employee, little money was set aside to fund these benefits even though

9 an actuarial liability arose. *Id*.  As of June 30, 2011, the City's unfunded liability for OPEB

10 benefits was estimated to be $61 million, and there is no money or assets set aside that either

11 fund or pre-fund these obligations. *Id*.  The City's pay-go payment is over $600,000 annually,

12 and its Annual Retirement Contribution (ARC) for OPEB benefits is over $6 million. *Id*.

13              **d.**        **The City's Unfunded Long Term Liabilities In Internal Service**

14                        **Funds.**

15            The City established Internal Service Fund accounts for several purposes pursuant to

16 accepted governmental accounting practices. Simpson Dec., ¶14  An Internal Service Fund is a

17 fund for goods and services provided for specific purposes. *Id*.  The City establishes rates for

18 each Internal Service Fund and then charges each department within the City for the goods and

19 services provided to that department. *Id*.  For example, the City has Internal Service Funds for

20 fleet services (vehicles, vehicle maintenance and related costs), liability and property insurance

21 (for the City's self-insurance program and payment of claims), worker's compensation

22 insurance, unemployment insurance, telephone support (for the City's communication system),

23 utilities (for the City's utility costs) and central services (for reproduction and copying services).

24 *Id*.  All the reserves in the City's Internal Service Fund accounts have been depleted, and its

25 worker's compensation and liability and property insurance funds are underfunded by an

26 estimated $20 million. *Id*.  The need to replenish funding for long term liabilities in the City's

27 Internal Service Funds contributes to and is in addition to the City's budget deficit this year. *Id*.

28 Adequate reserves for these liabilities are essential for responsible City operations. *Id*.

Stradling Yocca
Carlson & Rauth
Lawyers
Newport Beach

-15-
MEMORANDUM OF FACT AND LAW
DOCSOC/1574235v10/200430-0003

1

### e. Debt Obligations Burden The General Fund.

2    The City's outstanding bonded indebtedness is approximately $90 million. Simpson Dec.,

3   ¶ 15.  To address growing public safety pension obligations, the City issued pension obligation

4   bonds ("POBs") in 2005 which reduced unfunded pension liabilities.  The City's annual pension

5   costs were reduced by $2 million after the issuance of the bonds. *Id*.  However, the issuance of

6   bonds and subsequent deposit of bond proceeds into the City's public safety account was ill-

7   timed as it occurred before CalPERS lost a significant amount of its pension portfolio in the

8   financial markets. *Id*.  These losses negatively impacted the City beyond the loss of its deposited

9   funds and have surpassed all the saving realized from the issuance of the POBs. *Id*.  The City's

10  POBs liabilities will only increase over time. *Id*.  The City's current annual approximate $3.3

11  million debt payment on its POBs is anticipated to nearly double by fiscal year 2021-22.  In

12  addition, the City has outstanding capital lease obligations approaching $16 million for critical

13  City assets such as City Hall, police, library and fire facilities. *Id*.  The City also leases

14  equipment critical to the health, safety and welfare of its residents such as fire engines, police

15  vehicles, fire station alerting systems, refuse trucks and other critical equipment. *Id*.  The City

16  has infrastructure loans for capital improvements in addition to the debt obligations described

17  above. *Id*.

18

### 3. Service Reductions Have Harmed The Community.

19   Along with reductions in many non-public safety programs over the last several years, the

20  City made reductions in public safety staffing and services that have negatively affected the

21  safety and welfare of the City's residents. Travis-Miller Dec., ¶¶ 13 and 15.  These reductions

22  include the elimination of City positions through layoffs and unfilled vacancies and have

23  translated into service reductions. *Id*.  San Bernardino has fewer police officers and a higher

24  crime rate. *Id*.  Further cuts in public safety may be felt acutely because of the particular need for

25  police services in the City. *Id*.  San Bernardino's crime rates are higher than the national and

26  state averages. *Id*.  The City also has fewer firefighters now than in past years. *Id*.

27

28

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-16-

MEMORANDUM OF FACT AND LAW

DOCSOC/1574235v10/200430-0003

III.    **THE CITY IS AN ELIGIBLE DEBTOR UNDER CHAPTER 9 OF THE**
        **BANKRUPTCY CODE**

The City was, and still is, plagued by extremely serious cash flow problems which, absent the protections of Chapter 9, will grow significantly worse and result in a shut down of the City and creditor actions to seize essential City assets.  Only with the protections afforded by Chapter 9 can the City focus on and devote its efforts to the challenging task of restoring financial stability to the City and developing a plan of adjustment of its debts.  The facts in this case evidence that the City had no choice but to seek bankruptcy protection under Chapter 9 as a last resort and the City is eligible to be a Chapter 9 debtor.

The purpose of Chapter 9 is to provide a municipality with "temporary protection from debt collection efforts so that it may establish a plan of adjustment with its creditors." *In re Valley Health Sys.*, 383 B.R. 156, 163 (Bankr. C.D. Cal. 2008) ("*Valley Health*"). *See also*, *In re County of Orange*, 183 B.R. 594, 608 (Bankr. C.D. Cal. 1995) ("*Orange County*") ("[The] general policy of Chapter 9 is to give a debtor a breathing spell from debt collection efforts so that it can work out a repayment plan with creditors." *citing* H.R. Rep. No. 595, 95th Cong., 1st Sess. 263 (1977)).  Unlike cases filed under other chapters of the Code, the filing of a voluntary petition under chapter 9 does not automatically constitute entry of an order for relief.  Rather, a petitioner must meet certain criteria to be eligible for relief.

The petitioner must meet five essential elements for eligibility set forth in 11 U.S.C. § 109(c).  Specifically, Code § 109(c) provides that an entity is eligible to be a debtor under chapter 9 if it:

(1) is a municipality;

(2) is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;

(3) is insolvent;

(4) desires to effect a plan to adjust such debts; and

-17-

MEMORANDUM OF FACT AND LAW

1  (5)(A) has obtained the agreement of creditors holding at least a majority in

2  amount of the claims of each class that such entity intends to impair under a plan

3  in a case under such chapter;

4  (B) has negotiated in good faith with creditors and has failed to obtain the

5  agreement of creditors holding at least a majority in amount of the claims of each

6  class that such entity intends to impair under a plan in a case under such chapter;

7  (C) is unable to negotiate with creditors because such negotiation is

8  impracticable; or

9  (D) reasonably believes that a creditor may attempt to obtain a transfer that is

10  avoidable under section 547 of title 11.

11  11 U.S.C. § 109(c).  These eligibility criteria are construed "broadly to provide access to relief in

12  furtherance of the Code's underlying policies." *Intl Ass'n of Firefighters, Local 1186 v. City of*

13  *Vallejo* (*In re City of Vallejo*), 408 B.R. 280, 288 (B.A.P. 9th Cir. 2009) ("*Vallejo*") (*quoting In*

14  *re Valley Health Sys.*, 383 B.R. 156, 163 (Bankr. C.D. Cal. 2008)).

15  The petitioner has the burden of satisfying each of the five elements of Code § 109(c).

16  *Orange County,* 183 B.R. at 599; *In re City of Stockton,* 2012 Bankr. LEXIS 3234 (Bankr. E.D.

17  Cal. July 13, 2012) ("*Stockton*") ("The burden of proof, at least as to the five § 109(c) elements,

18  is on the municipality as the proponent of voluntary relief."); *Vallejo,* 408 B.R. at 289; *Valley*

19  *Health,* 383 B.R. at 161.  In the *Stockton* case, the court explained the standard of proof for the

20  Section 109(c) elements as follows:

21  "The quantum of proof, there being no contrary indication in statute or in

22  controlling decisional law, is the familiar preponderance-of-evidence standard of

23  basic civil litigation. Nothing suggests there should be a higher burden. This

24  conclusion comports with the argument by the authors of the Collier treatise that

25  the burden should be liberally applied in favor of granting relief. 2 Collier ¶

26  109.04 [3]."

27  *Stockton*, 2012 Bankr. LEXIS 3234, 6-7.  Proof by a preponderance of the evidence means that it

28  is sufficient to persuade the finder of fact that the proposition is more likely true than not. *See,*

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-18-

MEMORANDUM OF FACT AND LAW

DOCSOC/1574235v10/200430-0003

1    *e.g., In re Winship*, 397 U.S. 358, 371, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970);  *United States ex*

2    *rel. Farmers Home Admin. v. Arnold & Baker Farms (In re Arnold & Baker Farm*s), 177 B.R.

3    648, 654 (B.A.P. 9th Cir. Ariz. 1994).  As established below, the City has demonstrated by a

4    preponderance of the evidence that it is eligible to be a chapter 9 debtor.

5    **A.      The City Is A Municipality Under Section 109(c)(1).**

6    The petitioner under chapter 9 must be a municipality. 11 U.S.C. § 109(c)(1).  11 U.S.C.

7    § 101(40) defines a municipality as a "political subdivision or public agency or instrumentality

8    of a State." 11 U.S.C. § 101(40).  The City is a political subdivision of the State of California and

9    is a municipality within the meaning of Section 109(c)(1). *See*, Qualifications Statement [Docket

10    71].

11    **B.      California Law Authorizes The City To File Its Petition As Required by**

12    **Section 109(c)(2).**

13    A petitioner must be specifically authorized under state law to be a debtor under chapter

14    9 of the Code. 11 U.S.C. § 109(c)(2).  Assembly Bill 506 ("AB 506") was passed in 2011 and

15    codified at California Government Code sections 53760 through 53760.7.  While AB 506

16    amended the prior statute, the Governor in his signing message recognized and made clear that it

17    "did not prevent a municipality from declaring bankruptcy or even throw roadblocks in its path."

18    *See* Historical and Statutory Notes to Government Code section 53760.  Rather, AB 506 merely

19    put into place alternative steps for a local government to take before filing bankruptcy.

20    The procedural steps applicable to a municipality are set forth in Government Code §

21    53760 which provides:

22    A local public entity in this state may file a petition and exercise powers pursuant

23    to applicable federal bankruptcy law if either of the following apply:

24    (a) The local public entity has participated in a neutral evaluation process

25    pursuant to Section 53760.3.

26    (b) The local public entity declares a fiscal emergency and adopts a resolution by

27    a majority vote of the governing board pursuant to Section 53760.5.

28

-19-
MEMORANDUM OF FACT AND LAW

DOCSOC/1574235v10/200430-0003

1   Cal. Govt. Code § 53760.  In other words, a municipality in California may file a petition after it

2   takes either one of two procedural steps: (a) participates in a "neutral evaluation process"

3   pursuant to Section 53760.3; or (b) declares a fiscal emergency and adopts a resolution by a

4   majority of its governing board pursuant to Section 53760.5.

5       Here, the City followed Government Code section 53670(b) by declaring a fiscal

6   emergency and adopting a resolution by a majority vote of its Common Council pursuant to

7   Section 53760.5. *See*, Ex. G to Hanna Dec. The relevant procedural steps of Government Code

8   section 53760.5 require that: (1) prior to a declaration of fiscal emergency, an item be placed on

9   the agenda of a noticed public hearing on the fiscal condition of the City to take public comment;

10  (2) a fiscal emergency must be declared; and (3) a resolution must be adopted by a majority vote

11  of the governing board at a noticed public hearing that includes findings that the financial state of

12  the City jeopardizes the health, safety or well-being of the City's residents absent the protections

13  of Chapter 9.  Cal. Govt. Code § 53760.5.  The City complied with these procedural

14  requirements.

15      As set forth in section II (A), *supra*, in late June of 2012, the dire nature of the City's

16  liquidity crisis and magnitude of the City's current fiscal year projected budget deficit became

17  apparent after the City's Finance Department completed the Budget Report which, *inter alia*,

18  determined that: (1) the City has operated at a deficit for the last four consecutive fiscal years

19  and depleted its General and Internal Service Fund reserves; (2) the starting General Fund

20  balances had been erroneously stated for the last two fiscal years and totaled over $4.5 million

21  *less* than the balances reported by City staff and the General Fund cash beginning balance was

22  estimated to be a negative $18.2 million for the current fiscal year; (3) the City faced a

23  preliminarily projected $45.8 million budget deficit in the current fiscal year; and (4) the City's

24  ability to meet its financial obligations, including its August payroll, was in jeopardy given the

25  significant cash flow deficits this fiscal year.  Simply put, the City faced a gigantic financial hole

26  and had no expedient and viable way to fill it.

27      Thus, the City placed on the July 10, 2012 agenda of a noticed meeting of the Mayor and

28  Common Council that there would be a discussion on the City's budget for the fiscal year

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-20-

MEMORANDUM OF FACT AND LAW

DOCSOC/1574235v10/200430-0003

1  2012/2013 and taking possible action on authorizing the filing of a petition under Chapter 9. *See*,

2  Ex. D to Hanna Dec.  The Budget Report was presented, considered and discussed at that

3  meeting and public comments were taken.  The following week, the City placed on the agenda of

4  the July 16, 2012 noticed meeting of the Mayor and Common Council an item for discussion

5  concerning a declaration of fiscal emergency in the City and taking possible action on

6  authorizing the filing of a petition under Chapter 9. *See*, Ex. E to Hanna Dec.  Again, after

7  further presentations, discussions and public comments regarding the City's dire fiscal condition,

8  that meeting was adjourned and continued to July 18, 2012. *See*, Ex. F to Hanna Dec.  At the

9  July 18 meeting, the Common Council considered the Staff Report and additional presentations

10  which included, among other things, a cash flow analysis for the months of July 2012 through

11  September 2012 which showed that the City's cash flow deficit ranged between about $2 million

12  and $5.6 million during each month of that time period. *See*, Exs. I and J to Hanna Dec.

13  Following the discussions and public comments that took place at the three noticed

14  meetings of the Mayor and Common Council held on July 10, July 16 and July 18, a majority of

15  the members of the Common Council voted to declare a fiscal emergency and approved a

16  resolution finding that: (1) the City is or will be unable to pay its obligations within the next 60

17  days, and that the financial state of the City jeopardizes the health, safety or well-being of the

18  residents of the City absent the protections of Chapter 9; and (2) given the City's dire financial

19  condition, it was in the best interest of the City to declare a fiscal emergency. *See*, Ex. G to

20  Hanna Dec.  These actions evidence that the City complied with the procedural requirements of

21  Government Code § 53760.5.

22  **C.    The City Meets The Insolvency Requirement Of Section 109(c)(3).**

23  The City discovered in June 2012 that it had depleted all its cash reserves to keep the City

24  afloat and plug budget deficits for the last four consecutive fiscal years.  At that time, it also

25  learned that it began its current fiscal year on July 1, 2012 with a negative General Fund cash

26  deficit balance of over $18.2 million and faced a preliminarily projected budget deficit of $45.8

27  million in its current fiscal year.  The City had a severe cash flow crunch, and City's available

28  cash in the General Fund reached a negative fund balance of $18.5 million and as low as about

-21-

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

MEMORANDUM OF FACT AND LAW

DOCSOC/1574235v10/200430-0003

1  $150,000 citywide including the restricted or committed special funds separate from the General

2  Fund.  In fact, the General Fund would have run out of cash completely if the City had not taken

3  steps to maintain liquidity in the two weeks preceding the filing of the Petition.  Not only was the

4  City cash insolvent and not paying its debts when due, but the City's cash flow projections show

5  that the City will be cash insolvent and unable to pay its debts as they become due throughout the

6  fiscal year.  The bottom line is that the City had reached its breaking point.  These facts

7  demonstrate that the City was insolvent as of the Petition Date.[21]

8                    **1.        The Legal Standard For Insolvency.**

9          The Bankruptcy Code defines the term "insolvent" for municipalities.  A municipality is

10  insolvent if it is not paying its bona fide debts as they come due or is unable to do so.  *Vallejo*,

11  408 B.R. at 289.   The term "insolvent" for municipalities means:

12          "(C) with reference to a municipality, financial condition such that the

13          municipality is--

14          (i) generally not paying its debts as they become due unless such debts are the

15          subject of a bona fide dispute; *or* (ii) unable to pay its debts as they become due."

16  11 U.S.C. § 101(32)(C)(i) and (ii).  Emphasis added.

17          Insolvency is determined based on the debtor's financial condition as of the petition date.

18  *In re City of Bridgeport*, 129 B.R. 332, 336-37 (D. Conn. 1991) ("*Bridgeport*").  Insolvency is

19  evaluated on a cash flow analysis. *Vallejo,* 408 B.R. at 289-90.  A municipality is not required to

20  wait until it runs out of money, fails to pay its employees and defaults on its debts before it is

21  deemed insolvent.  *Bridgeport,* 129 B.R. at  338.  The Bridgeport court determined that:

22          "Cities cannot go out of business.  On the contrary, Chapter 9 is intended to

23          enable a financially distressed city to "continue to provide its residents with

24          essential services such as police protection, fire protection, sewage and garbage

25  _____

26  [21] Attached as Exhibit A to the Simpson Declaration is a report entitled "City of San Bernardino, California
    Estimated Cash Balance as of 7/31/12" which reflects the balances of the funds citywide as of the close of business
27  on July 31, 2012 and categories for each of those funds (either General Fund available, Other Discretionary Funds,
    Assigned/Committed by Council or Legally Restricted (External or Charter).  See, Simpson Dec., ¶21. Exhibit A
28  shows that the City did not have enough restricted and unrestricted cash available to pay its financial obligations
    then due as of the Petition Date.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-22-

MEMORANDUM OF FACT AND LAW

DOCSOC/1574235v10/200430-0003

1    removal, and schools [internal citation omitted]. . ., while it works out a plan to

2    adjust its debts and obligations."  A construction of §101(32)(C) under which a

3    city would not be able to seek chapter 9 protection unless and until it was actually

4    not paying its bills could defeat that purpose, as actually not paying bills could

5    lead to the non-delivery of services." Id. at 336-37.

6    The insolvency requirement can be satisfied by meeting either 11 U.S.C. § 101(32)(C)(i) or (ii).

7         The insolvency analysis focuses on the General Fund.  Money in the General Fund is

8    unrestricted and supports public safety and other essential municipal services.  However, unlike

9    the General Fund, other City funds are frequently restricted by law, contract, or grant and

10   generally cannot be used to subsidize the General Fund without limitations. *Vallejo*, 408 B.R. at

11   293 (rejected argument by unions that Vallejo "should have pillaged all of its component agency

12   funds, ignoring bond covenants, grant restrictions, and normal GASB and GAAP practices, to

13   subsidize its General Fund"); *Pierce County*, 414 B.R. at 711 ("[a]lthough the Debtor has

14   substantial assets and cash reserves, it has very limited funds and other assets that are not subject

15   to a pre-existing limitation or restriction on their use.").

16        **2.        The City Was Insolvent On The Petition Date Because It Generally**

17                   **Did Not Pay All of Its Bona Fide Debts When Due.**

18        The City did not have enough unrestricted cash to pay its bona fide debts when due and,

19   therefore, approved the Fiscal Emergency Plan eight days before the Petition Date to maintain

20   liquidity.  Under the Fiscal Emergency Plan approved on July 24, 2012, the City did not pay: (1)

21   a debt due on July 20, 2012 in the amount of about $3.3 million for its pension bond obligations,

22   (2) a payment due under a note for its financial accounting software system in the amount of

23   $645,000; (3) bi-monthly payments to fund retiree health obligations due in the first quarter in

24   the amount of $2,219,332; (4) other trade payables due and owing in an amount of over $6

25   million. Simpson Dec., ¶25.  This was a necessary measure to maintain liquidity so that the City

26   could preserve enough cash to make the City's August payroll and continue essential operations

27   through September 2012 under its Fiscal Emergency Plan. *Id*.  The City also did not make the

28   payments under the settlements in the Lawsuits in the amount of $1,461,000 because of its

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-23-

MEMORANDUM OF FACT AND LAW

DOCSOC/1574235v10/200430-0003

1  liquidity crisis. *Id.*  Unlike the situation in the *Bridgeport* case, the City had no reserves to resort

2  to for payment of these obligations.  Based on these facts alone, the City is insolvent under

3  section 109(c)(3)(i).

4  **3.    The City Was Insolvent On The Petition Date Because It Was Unable**

5  **And Would Be Unable to Pay Its Debts As They Became Due In Its**

6  **Current Fiscal Year.**

7  A municipality that demonstrates it will be unable to pay its debts in its fiscal year is

8  insolvent within the meaning of section 101(32)(C) and section 109(c)(3).  *Bridgeport* 129 B.R.

9  at 338; see also *In re Pierce Cnty. Hous. Auth.*, 414 B.R. 702, 710-11 (Bankr. W.D. Wash. 2009)

10  ("*Pierce County*") (The second prong of the insolvency analysis is a prospective test and it must

11  be determined as of the petition date whether the debtor will be unable to pay its debts as they

12  become due); *Caruso Enter., Inc. v. U.S.A. Motel Corp. (In re U.S.A. Motel Corp.)*, 450 F.2d

13  499, 503 (9th Cir. 1971) ("The statutory requirement of inability to meet debts as they mature is

14  not limited to debts which have already matured.").

15  In *Vallejo*, the Ninth Circuit affirmed the court's determination that Vallejo was

16  insolvent "as of the petition date because the city's General Fund would (1) begin the

17  fiscal year 2008-2009 with no reserves (and possibly with a negative balance); (2)

18  operate at a multi-million dollar deficit in fiscal year 2008-2009; and (3) would not have

19  sufficient available funds and cash flow to pay Vallejo's debts as they became due."

20  *Vallejo,* 408 B.R. at 288.  In particular, Vallejo "would not have been able to pay the

21  General Fund payroll that became due on July 11, 2008." *Id. See also, Bridgerort*, 129

22  B.R. at 337 (insufficient cash flow to pay bills when they are due establishes insolvency

23  under chapter 9).  The City's dire financial condition is similar to the situation in the

24  *Vallejo* case but worse, in part, because the City began its current fiscal year with an

25  $18.2 million cash deficit in the General Fund.

26

27

28

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

4.     **The City's Revenue And Expenditure Projections Demonstrate That The City Is Cash Flow Insolvent In Its Current Fiscal Year.**

In this section, the City discusses in some detail its projected General Fund revenues and expenditures for the current fiscal year and demonstrates that it is insolvent.  An analysis of the City's projected revenue and expenditures in its current fiscal year demonstrates that the City was unable and will not be able to pay its debts as they become due.[22]  The City's cash flow analysis shows that the City would have a cash flow deficit in its current fiscal year. Simpson Dec., ¶ 22.  The City exhausted all of its reserves shoring up budget deficits for the last four consecutive fiscal years. Simpson Dec., ¶ 8. Its current projected $45.8 million budget deficit is too big to bridge through cuts in services and compensation alone, while still providing adequate essential services to ensure the health, safety and well-being of its citizens.

a.     **The City's Revenues Will Be Essentially Flat.**

The City does not have a balanced budget for its current fiscal year.  Simpson Dec., ¶ 16. The trends from the last several years remain the same in its current fiscal year -- while the City's revenues have not recovered following the steep declines of the Great Recession and housing bubble burst, its General Fund expenses remain the same or are increasing. *Id*.  The City preliminarily projects that General Fund revenues will be approximately $120,424,165, while projected expenditures are $166,236,557. *Id*., *See* Ex. C to Hanna Dec.  The City's total labor costs alone exceed all of its projected revenue. *Id.*  The City's financial challenges are substantial because none of the City's major expense categories are projected to decrease in this fiscal year and, instead, aggregate expenditures are projected to increase by 8.93%. *Id.*

Adverse economic conditions will continue to affect the City's primary revenue sources: property taxes, sales taxes, utility user taxes, franchise taxes, and business license taxes, which combined account for most of General Fund revenue. Busch Dec., ¶19.  Despite, the City's estimate of a slight increase in property taxes from fiscal year 2011-12 to fiscal year 2012-13, the City estimates that it faces over $17 million of non-residential property tax appeals exposure, which if granted by the County would yield further reductions in property tax revenues.

---

[22] These revenue and expenditure projections are as of the Petition Date.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-25-

MEMORANDUM OF FACT AND LAW
DOCSOC/1574235v10/200430-0003

1    Simpson Dec., ¶ 9.  However, a major factor that continues to depress property tax revenue is the

2    structure of California's property tax system. Busch Dec., ¶19. Under California's property tax

3    system, absent a change in ownership or new construction on the property, annual assessed value

4    adjustments are limited to the lesser of the change in the California consumer price index or two

5    percent. Cal. Const., art. XIIIA, § 2.  As a result, the high rate of foreclosures and short or

6    distressed sales in San Bernardino will negatively affect the City for years to come with lower

7    property tax revenues and growth rates. Busch Dec., ¶6.  The City estimates that sales and other

8    taxes will increase modestly.  Simpson Dec., ¶ 10.  The utility users tax and franchise tax depend

9    on resident use, while the business license tax depends on economic activity. *Id*.  In sum, General

10    Fund revenues for fiscal year 2012-13 will be essentially flat due to the City's depressed

11    economic climate. *Id*.

12                   **b.       The City's Distressed Financial Condition Prevented It From**

13                        **Borrowing From The Private Credit Markets.**

14            The City could not borrow money from the private credit markets to meet its obligations

15    because the City could not demonstrate the ability to pay back any such loan with revenues

16    generated in the current fiscal year.  Article XVI, Section 18 of the California Constitution

17    prohibits the City from incurring a debt in any year that exceeds the available revenues of the

18    City for that year, without the approval of two-thirds of the qualified voters.  Cal. Const., art.

19    XVI, § 18.  Basically, each year's City revenue must pay each year's City expenditures.  *See,*

20    *e.g., Barkley v. City of Blue Lake*, 47 Cal. App. 4th 309, 313 (1996) (Section 18 "construed to

21    require each year's debts and liabilities to be paid from that year's revenues, and to bar payment

22    from the revenue of any future year").  Given that the City projects a $45.8 million budget deficit

23    for the current fiscal year and has no General Fund reserves, a loan to the General Fund from a

24    private lender would create a debt that exceeded the City's available revenue for the fiscal year

25    that possibly may be in violation of Article XVI, Section 18.  Just like in the *Vallejo* case, the

26    City cannot borrow from the private credit market and need not pillage "all of its component

27

28

-26-

MEMORANDUM OF FACT AND LAW

1    agency funds, ignoring bond covenants, grant restrictions, and normal GASB and GAAP

2    practices, to subsidize its General Fund." *Vallejo*, 408 B.R. at 288.[23]

3                    c.        **The City Could Not Raise Revenues Fast Enough To Close Its**

4                              **Projected $45.8 Million Budget Gap Or Solve Its Liquidity**

5                              **Crisis.**

6              There was no readily available cure for the City's revenue problems.  Legal and

7    accounting requirements also limit the City's ability to raise or borrow money to close revenue

8    shortfalls.  Proposition 13 limits property tax rates to 1% of fair market value, subject to the

9    limitations described above, exclusive of voter-approved bonded indebtedness. Cal. Const., art.

10   XIIIA.  Proposition 218 limits the City's ability to raise any other taxes by requiring that a

11   majority of voters approve any new or increased general tax (one the proceeds of which can be

12   used for any purpose) and that a two-thirds majority approve any new or increased special tax

13   (one expressly limited to a specific purpose).  Cal. Const., arts. XIIIC and XIIID.  Further,

14   Proposition 218 places significant restrictions on the ability of the City to raise special

15   assessments or property related fees to cover specific costs and, in any event, these types of

16   revenues are not permitted to be used for general governmental purposes such as those funded

17   from the City's General Fund.  Cal. Const. Art. XIIID.

18             Locally, voters' enactment of Measure Z (a .25 percent district tax for 15 years enacted in

19   2006) to be used only to fund more police officers and support personnel and anti-gang and anti-

20   crime operations, including drug resistance education and supervised after-school youth

21   activities, leaves the City with limited opportunities to create new general purpose revenue

22   sources on its citizens with limited incomes, a significant percentage of which live at the poverty

23   level.  Obtaining voter approval for new taxes or borrowing is speculative under normal

24   circumstances.  It is even more uncertain in a city such as San Bernardino with significant

25

26   [23]Due to the late discovery and size of the City's growing $18.2 million cash deficit in the City's General Fund and
     liquidity problems discussed in Section II(A), *supra*, the City has been reluctantly forced to borrow from and use

27   restricted funds on a limited basis to make its payroll and provide essential services to ensure the health, safety and
     well-being of its residents.  However, unlike in the past, it is doing so now only as a necessary part of its efforts to

28   address its fiscal budgetary issues since the discovery of the City's dire financial problems and in this chapter 9 case,
     and intends to repay those borrowings.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-27-

MEMORANDUM OF FACT AND LAW

DOCSOC/1574235v10/200430-0003

1  poverty, a high unemployment rate and public concern over the City's past fiscal practices.  Even

2  where the City can lawfully raise revenue with voter approval, the harsh reality is that voters are

3  unlikely to impose higher taxes on themselves, particularly when so many residents live at or

4  near the poverty level and the overall current economic climate continues to adversely affect the

5  City.

6         While the City intends to pursue viable methods of generating new revenues and

7  enhancing existing revenue streams, raising taxes is not necessarily one of the tools available for

8  solving the City's fiscal problems.  *See, e.g., Cal. Bldg. Indus. Ass'n v. Governing Bd.*, 206 Cal.

9  App. 3d 212, 236-37 (1988) (intent of the supermajority requirement under Proposition 13 is that

10 voters are often not willing to impose taxes on themselves); *Candid Enters. v. Grossmont Union*

11 *High Sch. Dist.*, 39 Cal. 3d 878, 882 (1985) ("Although Proposition 13 authorizes the imposition

12 of 'special taxes' by a vote of two-thirds of the electorate, such special taxes have rarely been

13 imposed, remain novel, and as a consequence are evidently not perceived as a practical method

14 of school facility financing -- especially in view of the need for a two-thirds vote of the

15 electorate to approve them.").  Other sources of potential revenue are also limited.  For example,

16 the City is in the process of analyzing whether any nonessential real property it owns might be

17 sold to raise one-time revenue.  Simpson Dec., ¶ 16.  While the City has not yet completed its

18 analysis, the City does not believe that proceeds from the sale of City owned nonessential

19 property would result in sufficient proceeds to solve the City's projected $45.8 million budget

20 deficit. *Id.*

21            **d.      The City Could Not Make Enough Cuts To Close Its $45.8**

22                     **Million Budget Gap Without Endangering The Health, Safety**

23                     **Or Well-Being Of The City's Residents And Businesses.**

24        In response to the declining economy, the City reduced or eliminated funding for many

25 General Fund programs and services below levels that the City views as minimally acceptable.

26 The City intends to make even further reductions, but does not believe that these cuts alone can

27 solve the City's serious financial difficulties.  Public safety is a major concern in the City.

28 Travis-Miller Dec., ¶15.  Violent crime is above the state and national averages, and gang and

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-28-

DOCSOC/1574235v10/200430-0003

1   drug activity is increasing. *Id.* Further cuts to police protection may increase response time or

2   limit police response to only the most serious violent crimes in progress. *Id.* Investigating crimes

3   would take longer, and special units to prevent and abate crime may be reduced. *Id.* As for non-

4   safety positions, the City already has eliminated significant resources that otherwise would be

5   devoted to maintenance and repair. *Id.* at ¶13. As it stands now, City buildings, roads, trees, and

6   parks, that have begun to show neglect would deteriorate further. *Id.*

7          To prove insolvency, the City need not prove that it has cut every possible service.

8   *Vallejo*, 408 B.R. at 294. Even where additional cuts are theoretically possible, the City need not

9   attempt them if "municipal services are already underfunded" and further reductions would

10   threaten the City's ability to provide for the basic health and safety of its citizens. Even after the

11   City cut 250 positions in the last three years and is operating with the lowest number of staff in

12   many years despite a population increase of about 25,000 and increased demand and need for

13   City services, even more positions will be cut, and these cuts still will not be enough to balance

14   the City's 2012-13 budget. Travis-Miller Dec., ¶13. In fact, despite personnel cuts taken by the

15   City, the City's cost per employee is increasing, so it has not received any reduction in labor

16   costs as a result of those cuts. *Id.*

17          **D.     The City Satisfies Section 109(c) (4) Because It Desires To Effect A Plan To**

18                   **Adjust Its Debts.**

19          Pursuant to Section 109(c)(4), the City "must desire to effect a plan to adjust its debts."

20   11 U.S.C. § 109(c)(4). No bright-line test exists for determining whether a debtor desires to

21   effect a plan because of the highly subjective nature of the inquiry under section 109(c)(4), and

22   the petitioner "may satisfy this subjective requirement with direct and circumstantial evidence."

23   *Vallejo*, 408 B.R. at 295. Here, even while grappling with a serious liquidity crisis and the

24   limited time between late June 2012 and the Petition Date, the City actively took steps that

25   demonstrated its desire to effect a plan to adjust its debts. The City has taken additional steps

26   subsequent to the Petition Date that further evidence its desire to effect a plan of adjustment.

27          In the *Vallejo* case, the Court held that section 109(c)(4) was satisfied where the City of

28   Vallejo submitted a Statement of Qualifications which stated that it desired to effect a plan to

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-29-

MEMORANDUM OF FACT AND LAW

DOCSOC/1574235v10/200430-0003

1   adjust its debts under penalty of perjury, attempted to negotiate with its creditors prior to filing

2   but ran out of time due to an impending cash crunch and submitted evidence post-petition of a

3   pendency plan to adjust its debts. *Vallejo*, 408 B.R. at 295-96.  Similarly, in *In re New York City*

4   *Off-Track Betting Corp* case, the Court held that a statement by the municipality of its intent to

5   implement a plan of adjustment coupled with evidence of actions taken and/or being taken by the

6   municipality in furtherance of such intent should be sufficient to meet the statutory requirement.

7   *In re New York City Off-Track Betting Corp*., 427 B.R. 256, 272-73 (Bankr. S.D.N.Y.

8   2010)("*NYC OTB*"). See also, *In re Sullivan County Reg'l Refuse Disposal Dist*., 165 B.R. 60, 76

9   (Bankr. D.N.H. 1994) (post-petition submission of a draft plan of adjustment met § 109(c)(4)).

10        Here, just as in *Vallejo* and *NYC OTB*, the City filed its Qualifications Statement signed

11   by the City Manager that states under penalty of perjury that the City desires to effect a plan to

12   adjust its debts. See, Qualifications Statement [Docket No. 71].  The City's desire to effect a plan

13   to adjust its debts is also evidenced by the City's Fiscal Emergency Plan implemented on July

14   24, 2012 which was designed to provide a prospective path for the City to follow and enable it to

15   operate through September of 2012 while under Chapter 9 protection until a Pendency Plan

16   could be developed and presented to the Common Council for consideration. *See*, Ex. L to Hanna

17   Dec.  However, facing a severe cash flow crisis like in *Vallejo*, the City "filed its petition not to

18   buy time, but because it ran out of time" to negotiate with its creditors. *Vallejo*, 408 B.R. at 295.

19   As further evidence of the City's desire to effect a plan to adjust its debts, the City is developing

20   a Pendency Plan designed to result in an eventual plan of adjustment of its debts in this case.  For

21   these reasons, the City has satisfied section 109(c)(4).

22       **E.**    **The City Has Satisfied Section 109(c)(5)(C).**

23        Section 109(c)(5) provides four statutory alternatives for determining whether the City

24   meets this element of the eligibility criteria.  The City need satisfy only one of the four

25   alternatives to be found eligible for chapter 9 relief.  Here, the City demonstrates that it was

26   "unable to negotiate with creditors because such negotiation" was "impracticable" and that the

27   City reasonably believed that a creditor may attempt to obtain a transfer that is avoidable under

28   Code section 547. 11 U.S.C. §§ 109(c)(5)(C) and (c)(5)(D).

Stradling Yocca
Carlson & Rauth
Lawyers
Newport Beach

-30-

MEMORANDUM OF FACT AND LAW

DOCSOC/1574235v10/200430-0003

1.      **Negotiations With All Of The City's Creditors Was Impracticable.**

Section 109(c)(5)(C) is met if the City was unable to negotiate with all of its creditors because it was impracticable. In *Valley Health*, the Court stated:

> "impracticable" means "not practicable; incapable of being performed or accomplished by the means employed or at command; infeasible.' Webster's New International Dictionary 1136 (3d ed. 2002). In the legal context, impracticability' is defined as 'a fact or circumstance that excuses a party from performing an act, esp. a contractual duty, because (though possible) it would cause extreme and unreasonable difficulty.' Black's Law Dictionary 772 (8th ed. 2004)."

*Valley Health*, 383 B.R. at 163. "Impracticality is determined based on the facts of each case." *Vallejo*, 2008 Bankr. LEXIS 4433 (Bankr. E.D. Cal. Sept. 5, 2008).

Courts recognize that Section 109(c)'s eligibility requirements "are to be construed broadly to provide access to relief in furtherance of the Code's underlying policies." *Vallejo*, 408 B.R. at 288; *Valley Health*, 383 B.R. at 163. The following independent factors have supported findings that negotiation was impracticable:

--The debtor's need to file a petition quickly to preserve its assets for all of its creditors.[24]

--A large number of creditors in one or more classes.[25]

--The need to act quickly to protect the public from harm.[26]

---

[24] *In re Boise County*, 465 B.R. 156, 169 (Bankr. D. Idaho 2011) (County filed its petition to fend off what it perceived to be imminent execution on the County's accounts. The County's need to preserve its cash assets in order to maintain County operations uninterrupted for the benefit of its residents made further negotiations with impracticable.); *Orange County*, 183 B.R. at 594 ("Additionally, the event that caused the filing was the demand of lenders for additional collateral, which the OCIP could not meet, and the threat of liquidation of its portfolio. The OCIP had no time to enter into negotiations with its participants before acting to protect its portfolio assets."); *Valley Health Sys.*, 383 B.R. at 163.

[25] *In re Connector 2000 Ass'n*, 447 B.R. 752, 759 (Bankr. D.S.C. 2011) ("In Debtor's case, the number of bondholders is so large that it would be impossible for Debtor to have any type of negotiation with them, given that Debtor also does not even know the identity of the beneficial holders of the bonds."); *Orange County*, 183 B.R. at 607 ("Congress enacted § 109(c)(5)(C) specifically 'to cover situations in which a very large body of creditors would render prefiling negotiations impracticable.' *Sullivan County*, 165 Bankr. at 79 n.55."); *In re Villages at Castle Rock Metro. Dist. No. 4*, 145 B.R. 76, 85 (Bankr. D. Colo. 1990) ("It certainly was impracticable for [debtor] to have included several hundred Series D bondholders in these conceptual discussions.").

[26] *In re Boise County*, 465 B.R. 156, 169 (Bankr. D. Idaho 2011) citing *Valley Health*, 383 B.R. at 163.

MEMORANDUM OF FACT AND LAW

DOCSOC/1574235v10/200430-0003

1    --The lack of a viable business plan that addresses the debtor's ongoing financial

2    problems.[27]

3    All these factors are present here.

4        As explained in Section II, *supra*, the City did not learn until late June of 2012 that the

5    City had a negative $18.2 million cash deficit starting balance in its General Fund and a budget

6    deficit estimated to be over $45.8 million in its current fiscal year and no General Fund reserves.

7    At that time, the City also discovered that it did not have enough unrestricted cash available to

8    pay its financial obligations as and when those obligations were due or to become due beginning

9    in July of 2012 and continuing through the remainder of the current fiscal year and beyond.  Not

10   surprisingly, as the City's financial condition went public, the City's cash flow crunch grew

11   worse because, among other things, an unusually large number of employees were retiring and

12   leaving the City triggering immediate cash outs of leave accruals above annual averages and

13   vendors were demanding cash up front before providing essential materials, goods and services

14   to the City.  Further, the City's credit line had been terminated and the City had no ability to

15   access short term credit markets to solve its cash flow problems.  In fact, the City did not pay

16   certain bona fide debts prior to the Petition Date so that it could make its August payroll.  The

17   City's cash flow crisis was threatened by steps taken by creditors in the Lawsuits to obtain a writ

18   of execution and levy on the City's bank account.  Given these circumstances and the fact that

19   the City was struggling to maintain liquidity until a Chapter 9 case could be filed, the City did

20   not have the luxury of time to negotiate with its thousands of creditors and such negotiations

21   were impracticable.

22       In the *Orange County* case, the Court found that it was necessary to file chapter 9 to

23   preserve the assets of a municipality rather than delaying the filing to negotiate with creditors

24   and risk the assets of the municipality. *Orange County*, 183 B.R. at 608 ("The OCIP had no time

25   to enter into negotiations with its participants before acting to protect its portfolio assets.").

26   Similarly, in *Valley Health*, where the debtor had a liquidity crisis and was not able to develop a

27   business plan upon which meaningful negotiations could be based, prepetition negotiations were

28   _____
     [27] *Valley Health*, 383 B.R. at 165.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-32-

MEMORANDUM OF FACT AND LAW

DOCSOC/1574235v10/200430-0003

1   impracticable. *Valley Health*, 383 B.R. at 165 (rejecting the argument that section 109(c)(5)(c)

2   required either a showing that there were too many creditors to negotiate with or that prepetition

3   negotiations reached an impasse, the Court concluded, "Negotiation with creditors was not

4   practicable during the 37 days following voter rejection of Measure G given the District's

5   liquidity crisis, the number of its creditors, the risk of loss to its assets, and its resulting inability

6   to construct a realistic plan of adjustment.").

7         Here, just like in the *Orange County* case and *Valley Health* case, given the City's dire

8   cash flow crisis and no expedient and viable way to remedy it other than by failing to pay

9   creditors and thereby risking loss of the City's assets, negotiations with all of the City's creditors

10  was impracticable. *Valley Health*, 383 B.R. at 165 ("Meaningful negotiation is infeasible, if not

11  impossible, absent a plan of adjustment predicated upon a comprehensive business plan to return

12  a municipality to profitability.").  The City barely had the ability to maintain liquidity until a

13  Chapter 9 case was filed, let alone develop a comprehensive plan to resolve the City's structural

14  budget deficit and deal with the inevitably conflicting interests of all of the City's creditors,

15  assuming it could even identify all of them.  In fact, in the week prior to the Petition Date, the

16  City developed a Fiscal Emergency Plan implemented on July 24, 2012 to provide a prospective

17  path for the City to follow in order to enable it to operate through September of 2012 while under

18  Chapter 9 protection until a Pendency Plan could be developed which will lead to a plan of

19  adjustment.

20        Petitioners also may demonstrate impracticability by the sheer number of their creditors.

21  *Vallejo,* 408 B.R. at 298; *NYC OTB*, 427 B.R. at 276 ("Courts frequently find that negotiations

22  are impracticable where debtors have large numbers of creditors").  In *Vallejo*, the court found

23  negotiations with creditors impracticable where the City could not effectively identify all of its

24  retirees, potential tort claimants, and other creditors. *Vallejo*, 408 B.R. at 298.  Likewise, in

25  *Valley Health*, the Court found negotiations impracticable where the City sent out notice of the

26  case to 2,775 creditors and parties in interest, and claims totaled $100 million. *Valley Health*,

27  383 B.R. at 165.  Similarly, in *Pierce County*, negotiation was impracticable where the City had

28  thousands of potential creditors. *Pierce County*, 414 B.R. at 713.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-33-

MEMORANDUM OF FACT AND LAW

DOCSOC/1574235v10/200430-0003

1  Here, the City estimated that it has thousands of creditors and parties in interest and

2  potential claims totaling hundreds of millions of dollars.  *See*, Voluntary Petition [Docket No. 1].

3  It was simply impossible for the City to reach agreements with all of its creditors and be able to

4  avert the impending closure of the City, along with the inevitable stoppage of essential services,

5  during the limited time between June of 2012 when it discovered its financial crisis and the

6  Petition Date or even formulate a plan of adjustment on which meaningful negotiations could be

7  based.  The City has many creditor groups, including numerous union and employee groups,

8  equipment lessors, bondholders, indenture trustees, bond insurers and retirees.[28]  In fact, the City

9  has approximately 1,700 retirees alone, but did not have a single point of contact with them.[29]

10  Each of these parties has its own interests, which often conflict with the interests of other

11  creditors.  Bringing every single party into one global agreement, even if technically possible,

12  was extremely unlikely.  *See, e.g., NYC OTB*, 427 B.R. at 278 ("While some of these creditors

13  may yield . . . others may not").  Delaying the filing of its chapter 9 petition, and thus being

14  forced to shut down the City when it ran out of cash would have jeopardized the health, safety

15  and well-being of the City's residents.

**2.    The City Reasonably Believed That A Creditor May Attempt To
Obtain An Avoidable Transfer.**

18  As an additional and alternative basis, the City also meets section 109(c)(5) because the

19  City reasonably believed that a creditor may attempt to obtain a transfer that would be avoidable

20  under Section 547 of the Code.  Section 109(c)(5)(D) "is intended to allow a "municipality to file

21  its petition and obtain the benefits of the automatic stay while it negotiates its plan with creditors,

22  when aggressive creditor action may result in a preferential payment, which by its nature is

23  unfair to other creditors." 2 Collier ¶ 109.04[3][e][iv]." *Boise County*, 465 B.R. at 170.

---

[28] Some of these parties filed oppositions to the City's motion to approve its Notice of Commencement of the Case and set an objection deadline to its eligibility as a Chapter 9 debtor.
[29] Indeed, certain of those retirees recently sent a letter to the United States Trustee requesting appointment of a committee of retirees to provide a single point of contact for the retirees. *See*, Response Of Certain Retired Employees Of The City Of San Bernardino To The City's Motion For Entry Of Order (1) Directing And Approving Form Of Notice; And (2) Setting Deadline For Filing Objections [Docket No. 80].

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-34-

1    Section 109(c)(5)(D) has two requirements: (1) reasonable belief of the City that a

2    creditor may obtain a transfer; and (2) reasonable belief of the City that the transfer would be

3    avoidable under Section 547.  Here, on July 30, 2012, plaintiffs in the Lawsuits obtained on an

4    *ex parte* basis court orders directing that judgments be entered against the City in the Lawsuits.

5    The next day, on July 31, 2012, plaintiffs' counsel stated that plaintiffs would initiate

6    enforcement proceedings on an emergency *ex parte* basis if $1,461,000 was not paid within 24

7    hours. *See* Declaration of Arthur K. Cunningham at ¶¶ 8-11.  Plaintiffs' counsel stated that such

8    enforcement proceedings would include a writ of execution and writ of mandate, and that

9    plaintiffs had already begun taking steps to perfect liens against City property. *Id.*

10    The City's August payroll had to be made, and the City's bank required that the entire

11    amount be deposited and available two business days before payroll checks would be issued.  If

12    plaintiffs had been successful in obtaining writs of execution and levied on the City's bank

13    account, the City would not have been able to pay its August payroll and vendors that provide

14    essential services to the City.  Thus, the City reasonably believed that the plaintiffs in the

15    Lawsuits would attempt to obtain transfers from the City based on plaintiffs' counsel statements.

16    The City also reasonably believed that the court would grant relief necessary for judgment

17    enforcement on an expedited basis based on *Spain v. Mountanos*, 690 F.2d 742, 746 (9th Cir.

18    1982), the case cited by the court *sua sponte* in the court's order directing that judgment be

19    entered against the City.  The City also reasonably concluded that any transfer of City property

20    to plaintiffs by way of judgment enforcement proceedings would have been recoverable as a

21    preference under Section 547 based on the facts and applicable law.

22    **F.    The City Filed Its Petition In Good Faith.**

23    Pursuant to Code 11 U.S.C. § 921(c), if an objection is made to the petition, then the

24    court may dismiss the petition if it finds, after notice and a hearing, that the debtor did not meet

25    the Code's eligibility requirements or determines that the petition was not filed in good faith.[30]

26    11 U.S.C. § 921(c).  Dismissal for lack of good faith is permissive, not mandatory. *NYC OTB*,

27

28
_____

[30] While the City believes it has met 11 U.S.C. §921(c)'s good faith requirement here, the City maintains that the burden of proof is on any party opposing the City's eligibility to establish that the petition was filed in bad faith.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-35-

MEMORANDUM OF FACT AND LAW

DOCSOC/1574235v10/200430-0003

1   427 B.R. at 278 (*citing In re In re [sic] Pierce County*, 414 B.R. at 714 (citing 6 COLLIER ON

2   BANKRUPTCY 921.04 P [4])); *Orange County*, 183 B.R. at 599.  The primary function of the

3   good faith requirement in Section 921(c) is "to ensure the integrity of the reorganization process

4   by limiting access to its protection to those situations for which it was intended." *In re Sullivan*

5   *County Reg'l Refuse Disposal Dist.*, 165 B.R. 60, 80 (Bankr. D. N.H. 1994); *see also NYC OTB*,

6   427 B.R. at 278-79 ("the purpose of the filing must be to achieve objectives within the legitimate

7   scope of the bankruptcy laws.").  The City submits that the Court should determine that it filed

8   the petition in good faith based on the City's showing by a preponderance of the evidence that

9   the City has met the eligibility criteria set forth in 11 U.S.C. §109(c).

10      Courts and commentators examine a number of factors to determine whether the debtor

11   acted in good faith. *Pierce County*, 414 B.R. at 714; *OTB*, 427 B.R. at 278.  These include: (i)

12   the debtor's subjective beliefs; (ii) whether the debtor's financial problems fall within the

13   situations contemplated by chapter 9; (iii); whether the debtor filed its chapter 9 petition for

14   reasons consistent with the purposes of chapter 9; (iv) the extent of the debtor's prepetition

15   negotiations, if practicable; (v) the extent that alternatives to chapter 9 were considered; and (vi)

16   the scope and nature of the debtor's financial problems.  *Pierce County*, 414 B.R. at 714.

17      First, the City subjectively believed that filing this case was appropriate.  Faced with the

18   fact that it could not pay its August payroll and other obligations as and when these obligations

19   became due without defaulting on certain bond obligations, deferring payments for retiree health

20   care benefits and bills due for other services provided to the City, as well as the other severe

21   financial challenges discussed in Section II, *supra*, and no viable method to raise revenues fast

22   enough to solve its financial and liquidity problems, the City's subjective beliefs that filing a

23   Chapter 9 petition was appropriate are well-founded.

24      Second, the City's financial problems fall within the situations contemplated by Chapter

25   9.  Congress enacted chapter 9 in 1934 during the Great Depression to provide an insolvent

26   municipality with temporary relief and allow it to preserve assets while developing a plan to

27   adjust its debts.  The Great Recession has caused the City and its residents to suffer from the

28   same problems that occurred in the Great Depression: a bad economy, high unemployment,

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-36-

MEMORANDUM OF FACT AND LAW

DOCSOC/1574235v10/200430-0003

1  significant poverty, a substantial collapse in real property values following a land boom and a

2  structural budget imbalance where its projected expenditures exceed its projected revenue.

3       Third, the City filed its Chapter 9 petition for reasons consistent with the purposes of

4  Chapter 9, including reorganization of its debts and restructuring its relationships with its various

5  creditor constituencies.  The purpose of chapter 9 is "to afford a municipality temporary

6  protection from debt collection efforts so that it may establish a plan of adjustment with its

7  creditors."  *Valley Health*, 383 B.R. at 163.  Chapter 9's general policy "is to give a debtor a

8  breathing spell from debt collection efforts so that it can work out a repayment plan with

9  creditors."  *Orange County*, 183 B.R. at 608 (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 263

10  (1977)). As discussed in Section II, *supra*, the City filed its petition because of its cash flow

11  crisis and inability to pay its debts, creditor actions that threatened City assets, and structural

12  budget imbalance.  The City filed the Petition for the very reasons Chapter 9 exists, to obtain

13  "temporary protection from debt collection efforts so that it may establish a plan of adjustment

14  with its creditors" by reorganizing its debts and restructuring its relationships with its various

15  creditor constituencies through a plan of adjustment.

16       Fourth, as set forth in Section III(E), *supra*, the City believed that it was nearly

17  impossible that the City would reach agreements with all of its creditors and be able to avert the

18  impending closure of the City, along with the inevitable stoppage of essential services, during the

19  limited time between late June of 2012 when it discovered its financial crisis and the Petition

20  Date or even formulate a plan of adjustment.

21       Fifth, while the City considered alternatives to Chapter 9 in the Budget Report, including

22  continuing to attempt to fund its obligations from ongoing revenues and raising taxes, it

23  determined that these options could not solve its cash liquidity crisis and structural budget

24  imbalance and the City would shut down unless a Chapter 9 petition was filed.

25       Sixth, the scope and nature of the City's financial problems, which are described at length

26  in this Memorandum and the accompanying declarations, made chapter 9 the only responsible

27  option for the City to minimize the impact of its financial problems on creditors and other parties

28  in interest.

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-37-

MEMORANDUM OF FACT AND LAW

1    The City filed its Petition because it ran out of time and money.  Chapter 9 is the City's

2  last resort and the only forum in which it can solve its serious financial problems through a plan

3  of adjustment of its debts to restore fiscal stability to the City and its residents.

4  **IV.    CONCLUSION**

5    For these reasons, the City is eligible to be a debtor under Section 109(c) of the

6  Bankruptcy Code, and the City respectfully requests that the Court enter an order for relief.

7  Dated:  August 31, 2012                 STRADLING YOCCA CARLSON & RAUTH
                                           A Professional Corporation
8

9                                          By:    */s/ Paul R. Glassman*
                                                  Paul R. Glassman
10                                                Attorneys for City of San Bernardino, Debtor

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STRADLING YOCCA
CARLSON & RAUTH
LAWYERS
NEWPORT BEACH

-38-
MEMORANDUM OF FACT AND LAW
DOCSOC/1574235v10/200430-0003

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

100 Wilshire Blvd., Suite 440, Santa Monica, CA 90401.

A true and correct copy of the foregoing document entitled: CITY OF SAN BERNARDINO'S MEMORANDUM OF FACTS AND LAW IN SUPPORT OF THE STATEMENT OF QUALIFICATIONS UNDER SECTION 109(C) OF THE BANKRUPTCY CODE will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On August 31, 2012, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Jerrold Abeles    abeles.jerry@arentfox.com
- Joseph M Adams    jadams@lawjma.com
- Andrew K Alper    aalper@frandzel.com, efiling@frandzel.com;ekidder@frandzel.com
- Thomas V Askounis    taskounis@askounisdarcy.com
- Anthony Bisconti    tbisconti@bmkattorneys.com
- Jeffrey E Bjork    jbjork@sidley.com
- Sarah C Boone    sboone@marshackhays.com, ecfmarshackhays@gmail.com
- J Scott Bovitz    bovitz@bovitz-spitzer.com
- Jeffrey W Broker    jbroker@brokerlaw.biz
- Deana M Brown    dbrown@milbank.com
- Michael J Bujold    Michael.J.Bujold@usdoj.gov
- Christina M Craige    ccraige@sidley.com
- Alex Darcy    adarcy@askounisdarcy.com
- Susan S Davis    sdavis@coxcastle.com
- Robert H Dewberry    robert.dewberry@dewlaw.net
- Todd J Dressel    dressel@chapman.com, lubecki@chapman.com
- Chrysta L Elliott    elliottc@ballardspahr.com, manthiek@ballardspahr.com
- Scott Ewing    contact@omnimgt.com, sewing@omnimgt.com
- Paul R. Glassman    pglassman@sycr.com
- Everett L Green    everett.l.green@usdoj.gov
- Chad V Haes    chaes@marshackhays.com, ecfmarshackhays@gmail.com
- James A Hayes    jhayes@cwlawyers.com
- M Jonathan Hayes    jhayes@hayesbklaw.com, roksana@hayesbklaw.com;carolyn@hayesbklaw.com;elizabeth@hayesbklaw.com
- D Edward Hays    ehays@marshackhays.com, ecfmarshackhays@gmail.com
- Eric M Heller    eric.m.heller@irscounsel.treas.gov
- Bonnie M Holcomb    bonnie.holcomb@doj.ca.gov
- Whitman L Holt    wholt@ktbslaw.com
- Michelle C Hribar    mch@sdlaborlaw.com
- Steven J Katzman    SKatzman@bmkattorneys.com
- Jane Kespradit    jane.kespradit@limruger.com, amy.lee@limruger.com
- Mette H Kurth    kurth.mette@arentfox.com
- Richard A Marshack    rmarshack@marshackhays.com, lbergini@marshackhays.com;ecfmarshackhays@gmail.com
- Gregory A Martin    gmartin@winston.com
- David J Mccarty    dmccarty@sheppardmullin.com, pibsen@sheppardmullin.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

- Reed M Mercado    rmercado@sheppardmullin.com
- Aron M Oliner    roliner@duanemorris.com
- Scott H Olson    solson@seyfarth.com
- Dean G Rallis    drallis@sulmeyerlaw.com
- Christopher O Rivas    crivas@reedsmith.com
- Kenneth N Russak    krussak@frandzel.com, efiling@frandzel.com;dmoore@frandzel.com
- Gregory M Salvato    gsalvato@salvatolawoffices.com, calendar@salvatolawoffices.com
- Mark C Schnitzer    mschnitzer@rhlaw.com, mschnitzer@verizon.net
- Benjamin Seigel    bseigel@buchalter.com, IFS_filing@buchalter.com
- Diane S Shaw    diane.shaw@doj.ca.gov
- Jason D Strabo    jstrabo@mwe.com, losangelestrialdocket@mwe.com
- Matthew J Troy    matthew.troy@usdoj.gov
- United States Trustee (RS)    ustpregion16.rs.ecf@usdoj.gov
- Anne A Uyeda    auyeda@bmkattorneys.com
- Annie Verdries    verdries@lbbslaw.com
- Brian D Wesley    brian.wesley@doj.ca.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on <u>August 31, 2012</u>, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Honorable Meredith A. Jury (Personal Delivery)
U.S. Bankruptcy Court
3420 Twelfth Street, Suite 325 / Courtroom 301
Riverside, CA 92501-3819

Everett L Green (Personal Delivery)
Office of the US Trustee
3685 Main St Ste 300
Riverside, CA 92501

Twenty Largest Creditors:

Served on counsel via NEF:
2006 City of San Bernardino Taxable Pension Obligation Bonds, 2005, Series A
Wells Fargo Bank, N.A. Corporate Trust Services Special Accounts Group -
Jerrold Abeles    abeles.jerry@arentfox.com
Mette H Kurth    kurth.mette@arentfox.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Kohl's Corporate Offices
N56 W17000 Ridgewood Drive
Menomonee Falls, Wisconsin 53051
Scott H Olson    solson@seyfarth.com

US Bank, N.A., Trustee
633 West 5th Street, 24th Floor,
Los Angeles, California 90071
Jason D Strabo    jstrabo@mwe.com, losangelestrialdocket@mwe.com

California Infrastructure Bank and Economic Development Bank
980 9th Street, Suite 900
Sacramento, California  95814
Diane Shaw diane.shaw@doj.ca.gov

Marquette Bank,
10000 W 151ST ST,
Orland Park, Illinois  60462
Thomas V Askounis  taskounis@askounisdarcy.com

[The remainder of the List of 20 Largest Creditors are being served by the official claims agent; a separate proof of service will be filed]

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 31, 2012 | Christine Pesis | /s/ Christine Pesis |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
**DOCSOC/1581560v1/200430-0003**                                              **F 9013-3.1.PROOF.SERVICE**