# FOR PUBLICATION

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## RIVERSIDE DIVISION

FILED & ENTERED

MAR 07 2017

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY hawkinso DEPUTY CLERK

In re:

CITY OF SAN BERNARDINO,
CALIFORNIA,

           Debtor.

Case No. 6:12-bk-28006-MJ

Chapter 9

**MEMORANDUM OF DECISION RE ISSUANCE OF THIRD PARTY INJUNCTION IN CONJUNCTION WITH CONFIRMATION OF CHAPTER 9 PLAN**

Confirmation Hearing
Date:          December 6, 2016
Time:          1:30 p.m.
Courtroom:  302

      Facing a cash flow crisis of significant magnitude in the summer of 2012 with no end in sight, the City of San Bernardino ("City") declared an emergency under state law and filed a petition under Chapter 9[1] in the Bankruptcy Court on August 1, 2012. After a hard-fought battle over eligibility which resulted in this court finding the City was eligible because it had filed its chapter 9 petition in good faith and desired to propose a plan to adjust its debt[2], the City set about to propose such a plan. It began by shoring up its financial records so that its income and expense projections were reliable. This gave it an accurate picture of how it must impair its creditor body in order to achieve restructuring of its debt and revitalization of City services.  It mediated where possible and litigated where necessary to eventually be able to propose its Third Amended Plan of Adjustment ("Plan") which was by and large a consensual plan. After multiple

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and "Rule" references are to the Federal Bankruptcy Procedure.
[2] See In re City of San Bernardino, California, 499 B.R. 778, 779 (Bankr. C.D. Cal. 2013) (the "Eligibility Opinion").

confirmation hearings to resolve the few but significant objections to the Plan, on December 6, 2016, this court overruled the remaining objections and confirmed the Plan.

A lynchpin of the Plan was payment of 1% on the dollar on the allowed claims in Class 13, the class of general unsecured creditors. In support of confirmation, the City presented substantial unrefuted evidence which justified the necessity of such a low percentage payment to this creditor body so that the City could move forward with its 20 year Financial Model, which over time would bolster City services, revitalize the aging infrastructure, and substantially improve safety, in particular police services.  A significant component of Class 13 were litigation claimants ("Claimants"), who had either filed suit or made claims against the City based on its alleged wrongdoings, including Civil Rights Claimants who alleged claims under the Civil Rights Act.[3] Many of these Claimants asserted litigation claims not only against the City but also against it employees acting in the normal course of their employment, in particular members of the Police Department.  Under California law, the City is obligated to indemnify its employees for claims against them for acts arising within the scope of their employment. Unless the claims against these employees were addressed in the Plan, the indemnification requirement made the City face significant risk of an obligation to pay damages awarded against these employees at 100% on the dollar, payments which the City could not afford and still be able to perform under its Financial Model, its roadmap to revitalization.

The City addressed this risk by including in the Plan an injunction ("Plan Injunction") which would prevent Claimants from collecting damages awarded against certain Indemnified Parties[4] from those parties' assets or earnings, thereby insulating the City from the uncapped

---

[3] 42 U.S.C. §§ 1983 – 1988.
[4] Indemnified Parties are defined in the Plan as "the current and former officers and employees of the City who are entitled to indemnification."

indemnification claims which would arise under California law. Certain Claimants objected to inclusion of the Plan Injunction in the confirmed Plan; such objections were argued and overruled when the court confirmed the Plan. The court found that the Plan Injunction was a critical and essential element in the revitalization efforts of the City and that, without such, the City's opportunity to reorganize would be severely impacted. This Memorandum of Decision explains why the Plan Injunction is vital to the City's reorganization and proper under the law.[5]

## I. BACKGROUND

The Plan at Section XI.C provides injunctive relief which prevents pre-confirmation creditors from pursuing debt collection activities after confirmation not only against the City but also against "Indemnified Parties", defined in the Plan as "the current and former officers and employees of the City who are entitled to Indemnification"[6] (the "Plan Injunction"). Specifically, the Plan provided in pertinent part:

> Except as otherwise expressly provided in this Plan, all Entities who have held, hold, or may hold Pre-Confirmation Date Claims shall be permanently enjoined from and after the Confirmation Date, with respect to such Pre-Confirmation Date Claims, from: (i) commencing or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against the City or its property or any or all of the Indemnified parties or any of their property . . . .[7]

---

[5] This Memorandum of Decision supplements the Court's oral rulings on December 6, 2016, and earlier dates and the findings and conclusions contained in the Order Confirming Third Amended Plan entered on February 7, 2017. If this Memorandum or the Order are inconsistent with the oral rulings, the written documents will prevail.

[6] Indemnification means "rights of indemnity, defense, reimbursement, and advancement of fees and expenses of current and former officers and employees of the City with respect to any claims or lawsuits brought against such officers and employees by third parties, in each case arising out of an act or omission occurring within the scope of such officer's or employee's employment as an employee of the City." Plan, I.B.72.

[7] The full text of the Plan Injunction provides: "Except as otherwise expressly provided in this Plan, all Entities who have held, hold, or may hold Pre-Confirmation Date Claims shall be permanently enjoined from and after the Confirmation Date, with respect to such Pre-Confirmation Date Claims, from: (i) commencing or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against the City or its property or any or all of the Indemnified Parties or any of their property; (ii) enforcing, levying, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the City or its property or any or all of the Indemnified Parties or any of their property; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against the City or its property or any or all of the Indemnified Parties or any of their property; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due to the City or any or all of the Indemnified Parties, except as otherwise permitted by Bankruptcy Code section 553; (v) proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of this Plan or the settlements

Plan, XI.C. On September 30, 2016, the City filed modifications to the Third Amended Plan,

which were approved by the Court in the Confirmation Order, which limited the Plan Injunction

such that it only enjoined enforcement, not liquidation of the Litigation Claims, and allowed

Claimants to recover from any applicable insurer. New Section XI.G stated:

> Litigation Claims means (a) those lawsuits against the City that are still pending as of the Confirmation Date, including those listed in Exhibit 6 to the Appendix; (b) those lawsuits against the City that are filed on or after the Confirmation Date based on acts, claims or omissions that occurred or arose prior to the Confirmation Date; and (c) those lawsuits against any of the Indemnified Parties, whether filed prior to the Confirmation Date or on or after the Confirmation Date based on acts, claims or omissions that occurred or arose prior to the Confirmation Date, as to which lawsuits the City has assumed or will assume the defense thereof and became or becomes obligated to pay any judgment arising therefrom pursuant to Cal. Government Code §§ 825, 970, 995 and 996 and any other applicable law or rule.

Plan, XI.G.

Although written in generic terms, the primary purpose of the Plan Injunction was to

shield the City's employees, specifically its police officers, from litigation exposure and liability

for damages of Claimants who alleged the officers had violated their civil rights, as protected by

42 U.S.C. §1983. Under the California Government Code, all municipalities are obligated to

indemnify their employees for claims against them arising from the scope of their employment,

such indemnification to cover both the costs of defense and any damage award against the

employee ("Section 825 indemnification"). See Cal. Gov't Code §§ 825, 970, 995, and 996. At

the time of confirmation in this case, the City had approximately 115 lawsuits pending against it

and more than 200 other Claimants who had given notice of a claim but had not yet initiated

---

provided for in this Plan Documents; and (vi) taking any actions to interfere with implementation or consummation of this Plan." Plan, XI.C.

litigation. More than half of the lawsuits and many of the other Claimants asserted claims against the Indemnified Parties.

The Plan placed the Claimants in Class 13, a class comprised of all unsecured claims against the City that arose prior to confirmation of the Plan. Class 13 also included the claims of employees, retirees, and general trade creditors, among others, all of which totaled an estimated $200 million.[8] The Plan proposed to pay 1% on the dollar to all allowed claims in Class 13. As discussed more thoroughly below, the City asserted in its Disclosure Statement and submitted evidence at confirmation which demonstrated that the City could not afford to pay more than the specified 1% and still be financially able to pay all other preconfirmation debts pursuant to terms in the Plan as well as provide an acceptable level of services to its citizens as outlined in the Financial Model.[9]

The obligation of the City to provide § 825 indemnification to its employees is not a discharged preconfirmation claim under the terms of the Plan. The settlements the City negotiated with its employee unions and the operative collective bargaining agreements required the City to reaffirm its obligation to indemnify the employees. The City honored this commitment by reaffirming the obligation in the Plan at Section VII.D.

During the course of the Plan confirmation process, several of the civil rights Claimants objected to confirmation on multiple grounds, including the provision calling for the Plan

---

[8] By necessity, the estimate is preliminary, because no formal claims objection/allowance procedure was undertaken prior to Plan confirmation.

[9] Judge Christopher Klein in In re City of Stockton, California, 493 B.R. 772 (Bankr. E.D. Cal. 2013) presented a thorough analysis of the term "service delivery insolvency." In simple terms it means the inability of a municipality to "pay for all the costs of providing services at the level and quality required for the health, safety, and welfare of the community." Id. at 781. One goal of municipalities in filing Chapter 9 is to take steps to lessen service insolvency. In keeping with this purpose, the Plan here sought to lessen the substantial service insolvency which the City had experienced for many years prior to filing its petition and continuing to the confirmation date.

Injunction.[10]  They argued that they should be able to pursue their litigation claims against City

employees, allowing them not only to obtain a judgment or mediated resolution, but also to

exercise all enforcement and collection rights against such employees. The court entertained both

written and oral argument on these objections on multiple dates, culminating at the final hearing

on Plan confirmation on December 6, 2016.  At the December 6 hearing, the court overruled all

outstanding objections to confirmation, including those of the civil rights Claimants, and

confirmed the Plan, including the requested Plan Injunction.[11]

## II. DISCUSSION

A.   Arguments against Plan Injunction

Citing Ninth Circuit cases and other authorities, the civil rights Claimants assert that the

bankruptcy court has neither the jurisdiction nor the authority to control preconfirmation

creditors' actions against third parties.  They argue that in American Hardwoods, Inc. v.

Deutsche Credit Corporation (In re American Hardwoods, Inc.), 885 F.2d 621 (9th Cir. 1989) the

court determined that § 105(a) did not provide jurisdiction to the court because such injunctive

relief did not arise under Title 11, nor was it arising in or related to a case under Title 11, the

parameters set for the bankruptcy courts' subject matter jurisdiction in 28 U.S.C. §1334(b).

Moreover, they assert that even if the court has jurisdiction, it lacks the authority to essentially

grant a discharge to nondebtors, i.e. the Indemnified Parties, by ruling that the preconfirmation

creditors could not enforce judgments against them. The discharge is governed by §§ 524(a) and

---

[10] Among the other arguments made by the Civil Rights Claimants were (1) they should be separately classified and not in Class 13 with the other unsecured creditors; (2) debts arising under the Civil Rights Act (28 U.S.C. §§ 1983 - 1988) were not subject to discharge in a Chapter 9 plan; and (3) the payment of only 1% to Class 13 claimants was a violation of other applicable provisions of §1129 and § 943. The court addressed and overruled these other objections in its open court oral rulings. The Confirmation Order also has extensive findings and conclusions which establish the reasons for overruling all the objections. This memorandum is not intended to address those other grounds for objection.

[11]  The Confirmation Order was entered on February 7, 2017, making the court's ruling binding and effective.

6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(b), which empower the court to only discharge the debtor, not others. Since §105(d) states that the court's powers may not be exercised in a manner which is inconsistent with the provisions of the Bankruptcy Code, the Claimants argue that granting a discharge to the Indemnified Parties is inconsistent with the provisions of §§ 524(a) and (b), and, therefore, the court lacks authority to issue the Injunctive relief.

In additional objections, the Claimants assert that Ninth Circuit authority has definitively prevented debtors in chapter 11 proceedings from seeking third party injunctive relief. In Resorts International, Inc. v. Lowenschuss (In re Lowenschuss), 67 F.3d 1394 (9th Cir. 1995), the court rejected third party injunctive relief sought in the Chapter 11 plan because such relief was inconsistent with § 524(e).[12] Since § 1129(a)(1) requires a plan to comply with the applicable provisions of the Bankruptcy Code, the Lowenschuss court reasoned that a plan which was inconsistent with § 524(e) was patently unconfirmable.

Claimants recognize there is a split in circuit authority on the availability of third party injunctive relief, citing to Fourth and Sixth Circuit decisions in Menard-Sanford v. Mabey (In re A.H.Robbins Co.), 880 F.2d 694 (4th Cir. 1989) and Class Five Ne. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 848 (6th Cir. 2002), both of which found such relief was available in certain circumstances. Notwithstanding these authorities, however, they assert only extraordinary circumstances should lead to granting an injunction, such as when the protected parties contributed substantial assets to the reorganization process and would not so contribute unless they were protected under the plan, making the injunctive relief critical to the reorganization efforts. Here, the Indemnified Parties are not adding monetary value to the asset pool and the Plan does not hinge on their participation. In similar circumstances, courts have

---

[12] Section 524(e) states "Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."

rejected the injunctive relief. In re Boston Harbor Marina Co., 157 B.R. 726, 730 (Bankr. D.

Mass. 1993); In re Wash. Mut., Inc., 442 B.R. 314, 348 (Bankr. D. Del. 2011); In re 710 Long

Ridge Rd. Operating Co., II, LLC, 505 B.R. 163, 165 (Bankr. D.N.J. 2014).

At least one Claimant asserts that the Anti-Injunction Act, 28 U.S.C. § 2283, prohibits a

"court of the United States" from granting an injunction to stay proceedings in a state court

"except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction,

or to protect or effectuate its judgments." The Claimant argues that no such authorization exists

which would allow this court to stay state court civil rights litigation.

Finally, several Claimants submit that, in requesting the third party injunction, the Plan

seeks to circumvent the statutory scheme and protections of the Bankruptcy Code, running afoul

of the Supreme Court's decision in Law v. Siegel, 134 S. Ct. 1188 (2014). Per their argument, a

bankruptcy court may not use equitable doctrines (injunctive relief arises in equity) to overcome

or circumvent statutory requirements or proscriptions.  The Claimants have rights and remedies

accorded to them under § 1983 which the bankruptcy court cannot circumvent with an injunction

preventing them from proceeding against the wrongdoers.

B.   The City's responses justifying injunctive relief

The City refutes Claimant's objections to the Plan Injunction.

First, it asserts that the question of whether third party injunctive relief is available under

a Chapter 9 plan is an open question under Ninth Circuit authority. The City cites to the recent

case Deocampo v. Potts, 836 F.3d 1134 (9th Cir. 2016), which found that the rationale relied

upon by the court in Lowenschuss does not apply in Chapter 9 proceedings; such prohibition was

based on § 524(e) which was not incorporated into Chapter 9 proceedings under § 901. Because

the ability of the bankruptcy court to grant such relief was not at issue in Deocampo, the court

did not answer that question.  Therefore, the analogies made to Chapter 11 cases are inapposite

in this proceeding.

Second, it submits that the Ninth Circuit cases which prohibit injunctive relief in Chapter

11's nevertheless found as a preliminary matter that bankruptcy courts would have both

jurisdiction and authority to grant the relief if not prohibited by § 524(e). In <u>American

Hardwoods, Inc.</u>, the bankruptcy court ruled that the court had related to jurisdiction because the

recovery on a judgment against the closely related party could have an effect on the

administration of the debtor's bankruptcy estate. 885 F.2d at 623. The jurisdiction in this case

clearly exists: if the City is required to pay 100% on claims against the Indemnified Parties, the

necessary dollars to do so will far exceed the City's budget for paying claims and at the same

time provide necessary services to its citizens. The administration of the Plan will be

significantly impacted.

Section 105 provides the court with authority to approve the Plan Injunction. Such relief

is necessary to protect the debtor and the administration of the estate after confirmation. The

inapplicability of § 524(e) means such exercise of § 105 power is proper and in keeping with

carrying out the provisions of the Bankruptcy Code.

Having established the court has both jurisdiction and authority to issue a third party

injunction, the City turns its argument to the imperative need for such relief in this case.  For an

injunctive to be permissible, at a minimum it must be expressed and be supported by specific

factual findings.  Similar injunctive relief was sought but denied in the recent City of Detroit

Chapter 9. In adjudicating the Detroit Chapter 9 plan, Judge Stephen Rhodes sustained the

Section 1983 claimants' objections to the city indemnifying its police officers. This ruling was

not based on lack of jurisdiction or authority, which Judge Rhodes found existed, but because

"the record is devoid of any evidence suggesting that the additional protection of a third-party

release for these officers is necessary to the City's efficient and effective functioning, to its

revitalization, or to the success of its plan." In re City of Detroit, 524 B.R. 147, 265-67 (Bankr.

E.D. Mich. 2014).

The City embraces the standards enunciated in City of Detroit and recites its own, drawn

from the Deocampo decision: an injunction is permissible if (i) the injunction is express; (ii) the

injunction is an integral part of the reorganization; and (iii) the injunction is supported by

specific factual findings regarding the necessity of the injunction to the City's efficient and

effective functioning, to its revitalization, or to the success of the Plan. The City's brief then cites

to the evidentiary record presented to this court, which shows that absent the injunction, the City

will be unable to make the projected investments in its revitalization as reflected in the Financial

Model and as needed to support the Police Resources Plan which is part and parcel of the Model.

Additionally, unless the City restricts its payments on the unsecured claims to the proposed 1%,

it will not have the funds necessary for the reinvestment in it infrastructure and other services.

The City responds to the Anti-Injunction Act arguments on two grounds:  first, the

Bankruptcy Code read as whole is exactly the "Act authorized by Congress" which allows a

bankruptcy court to stay proceedings in a state court; and second, the Ninth Circuit has

determined that bankruptcy courts are not "courts of the United States" which would be subject

to the Anti-Injunction Act.

In response to the Law v. Siegel arguments, the City points out that the holding of the

Supreme Court in that case limited the use of equitable powers only when such exercise was in

direct contravention of specific provisions of the Bankruptcy Code.  No part of the Bankruptcy

Code prohibits third party injunctive relief in a Chapter 9.

10

### III. ANALYSIS

This court rules that it has both the jurisdiction and the authority to grant third party injunctive relief and that the exercise of this power is not precluded by the Bankruptcy Code or by precedential Ninth Circuit law. Moreover, based on the legal standard for granting such relief, as developed by the case law and proposed as the applicable standard by the City, and the evidentiary record filed in this confirmation proceeding, granting the Plan Injunction to protect the Indemnified Parties is not only warranted, but necessary for the administration of the confirmed Plan.

A.   The City's Statutory Obligation to Pay the Judgments against its Employees

The Plan Injunction arises from the City's state law obligations under California Government Code §§ 825, 970, 995 and 996 to indemnify its employees for judgments against the employees based upon employee acts or omissions arising within the scope of employment, and which act or omission was not due to actual malice, actual fraud or corruption. Acts or omissions outside the scope of employment, or due to actual malice, actual fraud or corruption, are referred to as the "Exceptions." Thus, subject to the Exceptions, the City is obligated to pay the debts created by entry of judgments against its employees. Pursuant to Government Code § 970.2, a court may issue a writ of mandate to compel the City to pay a judgment against one of its employees based on acts or omissions within the scope of employment. The statutory scheme imposes this duty on the City to ensure the "the zealous execution of official duties by public employees." Johnson v. California, 69 Cal. 2d 782, 792 (1968).

The City's obligation to indemnify typically arises in two circumstances. The first and most common circumstance is where the City assumes the defense of the employee at an initial stage of the lawsuit, well before a judgment is issued. Government Code § 995 requires the City

to assume the defense unless one of the Exceptions applies, and Government Code § 825

requires that the City pay any ensuing judgment entered in favor of a third party plaintiff. See

L.A. Police Protective League v. City of L.A., 27 Cal. App. 4th 168, 174-76 (1994). The second

more unusual circumstance is where the City refuses to assume the defense (presumably because

the City believes an Exception applies), a judgment is subsequently entered against the

employee, and it is judicially determined that none of the Exceptions apply. In that second fact

pattern, Government Code §§ 825.2 and 996.4 require that the City pay the judgment and all of

the employee's defense costs, and Government Code § 970.2 provides that a writ of mandate is

an appropriate remedy to compel the City to pay. See Pelayo v. City of Downey, 570 F. Supp. 2d

1183, 1195 (C.D. Cal. 2008); Farmers Ins. Grp. v. Cty. of Santa Clara, 11 Cal. 4th 992, 1002

(1995); Rivas v. City of Kerman, 10 Cal. App. 4th 1110, 1116 (1992); see also DeGrassi v. City

of Glendora, 207 F.3d 636, 641-42 (9th Cir. 2000) (explaining the operation of the applicable

Government Code provisions on municipal employee indemnification). Municipal employee

indemnity provisions of the Government Code also apply to claims against police officers arising

under 42 U.S.C. § 1983. Williams v. Horvath, 16 Cal. 3d 834, 845 (1976).

The State of California has long recognized that indemnification of police officers, in

particular, is a public good:

> The reason for the [police officer indemnification] rule is: The duties of
> policemen are performed for the benefit of the public, and the public is directly
> concerned in preserving and protecting these officers from the hazard of death or
> bodily injuries to which the performance of their official duties expose them.
> Aside from any considerations purely personal to the officer, it is for the public
> good that these officers, as instruments through which the city performs its
> functions, shall be shielded from the personal hazards [of litigation] which attend
> the discharge of their official duties. With such protection afforded, the public can
> expect that its laws will be zealously enforced without any hesitation occasioned
> by considerations of possible personal involvement in defending resulting
> litigation.

Sinclair v. Arnebergh, 224 Cal. App. 2d 595, 599 (1964) (internal citations omitted); see also

Monell v. Dep't of Soc. Servs., 436 U.S. 658, 713 n.9 (1978) (Powell, J., concurring) (finding

that the policy of municipalities to indemnify officials sued for conduct within the scope of their

authority "furthers the important interest of attracting and retaining competent officers, board

members, and employees.").

The indemnification of municipal employees, and particularly police officers, plays an

important role in the efficient and effective functioning of the City and its departments and

agencies, including the Police Department.[13] The City's Chief of Police, Jarrod Burguan,

testified that if the City was at risk of being unable to indemnify police officers in full for

liability against lawsuits alleging harms committed during the performance of their job duties as

officers, and the officers were thus exposed to personal liability and potential financial ruin, the

City would not be able to hire new police officers, many police officers would leave for more

financially stable municipalities or federal, state or county law enforcement agencies, and the

crime rate in the City would increase. Per Burguan's testimony, the City's Police Department has

already been hit hard because the opportunities for qualified candidates to serve in other agencies

with more financial stability and better equipment has made it difficult for the City to retain and

recruit officers. Impairing the City's indemnification obligations to the officers would pose

severe challenges to retention of existing officers and recruitment of new and lateral officers.

Despite the clear state law statutory obligation to indemnify officers and the practical

necessity of indemnifying officers to ensure officer morale and retention, the unrefuted evidence

provided by the declaration testimony of Michael Busch[14] and the exhibits attached thereto

---

[13] Decl. of Jarrod Burguan. September 30, 2016, ECF No. 1982.

[14] Michael Busch is the President and CEO of Urban Futures, Inc., engaged by the City to provide financial advisory services in all areas of the City's operations and throughout the entire Chapter 9 procedure. Mr. Busch's financial

shows that the City does not and will not have the funds necessary to both pay the judgments

against the City's employees and invest in the Police Resources Plan, among other things.[15] To

ensure the efficient and effective functioning of the City and its departments, and in particular

the City Police Department, the Plan provides for payment of judgments against the City, and

payment of judgments against the Indemnified Parties that the City is required under state law to

pay, in the same manner, i.e., as Class 13 Claims that receive a 1% payment on the allowed

claim. The Plan Injunction – which allows holders of Litigation Claims against the Indemnified

Parties to liquidate their claims to judgment in the state and federal courts, but enjoins collection

of any such judgment against the Indemnified Parties' personal assets – is the tool that allows the

City to implement its Plan.

Without the relief provided by the Plan Injunction, the City would not have the funds to

both pay creditors pursuant to the Plan and effect the necessary revitalization of municipal

services for its residents. The City has demonstrated that it has the funds to implement the 1%

distribution to creditors, and no evidence has been presented by anyone that there is more money

available to pay a higher distribution, including to holders of Litigation Claims that may obtain

judgments against the Indemnified Parties.

B. <u>The Court has the Jurisdiction and the Authority to Approve the Plan Injunction and
the Evidence Supports Approval.</u>

(1) Jurisdiction

This Court has jurisdiction to approve a chapter 9 plan that addresses the claims against

the Indemnified Parties. Under 28 U.S.C. § 1334(b), the court is granted jurisdiction over all civil

---

reports and projections have been submitted to the court regularly during this case and have never been seriously
challenged by any of the highly sophisticated and well-funded creditors actively involved in the case. The court has
substantial confidence in Mr. Busch's financial reports and his competency.

[15] Decl. of Michael Busch, September 30, 2016, ECF No. 1983.

proceedings arising under title 11, or arising in or related to cases under title 11. "Proceedings

related to the bankruptcy include . . . suits between third parties which have an effect on the

bankruptcy." <u>Celotex Corp. v. Edwards</u>, 514 U.S. 300, 307 (1995). In the Ninth Circuit,

bankruptcy court "related to" jurisdiction exists over enforcement of a judgment against a non-

debtor that could conceivably have an effect on the administration of the debtor's bankruptcy. <u>In

re American Hardwoods, Inc.</u>, 885 F.2d at 623 (explaining that a bankruptcy court has subject

matter jurisdiction to permanently enjoin a creditor from enforcing a state court judgment against

non-debtor guarantors because the enforcement of the state court judgment could conceivably

affect the administration of the debtor's plan). The ability of Claimants to enforce their claims

against the Indemnified Parties will certainly have a material effect on the City and its assets, its

payment obligations under the Plan, and the City's ability to devote post-confirmation assets to

the revitalization of municipal services.

Here, the combined effect of California Government Code §§ 825, 825.2, 995 and 996.4

is that the City must pay a judgment against its employees as long as none of the Exceptions

apply. The judgment is a debt of the City, enforceable by writ of mandate. <u>See</u> Government Code

§ 970.2. "The general rule is that relief sought nominally against an officer [of a public entity] is

in fact against the sovereign if the decree would operate against the latter." <u>Hawaii v. Gordon</u>,

373 U.S. 57, 58 (1963). Similarly, the "general rule is that a suit is against the sovereign 'if the

judgment sought would expend itself on the public treasury or domain, or interfere with the

public administration,' or if the effect of the judgment would be to 'restrain the Government

from acting, or to compel it to act.'" <u>Dugan v. Rank</u>, 372 U.S. 609, 620 (1963) (citing <u>Land v.

Dollar</u>, 330 U.S. 731, 738 (1947)). Under <u>Hawaii v. Gordon</u> and <u>Dugan v. Rank</u>, the City's

statutory Government Code § 825 obligation to pay the judgment makes the judgment a claim on

the City's treasury and certainly a "related to" claim under 28 U.S.C. § 1334. Therefore, the

Court has jurisdiction over such claims against the Indemnified Parties.

(2) Authority for the Plan Injunction

Section 105(a) provides that the Court may issue any order that is necessary or

appropriate to carry out the provisions of Title 11. The Ninth Circuit has previously declined to

approve third-party injunctions in chapter 11 cases on the basis that § 524(e) limits the court's

equitable power under § 105 to order the discharge of the liabilities of nondebtors. In re

American Hardwoods, Inc., 885 F.2d at 626. Section 524(e), however, is inapplicable in chapter

9 cases, and thus the holdings of American Hardwoods Inc. and its progeny do not control the

outcome here. See 11 U.S.C. § 901(a) (not including § 524(e) in chapter 9); Deocampo v. Potts,

836 F.3d at 1143 ("Chapter 9, unlike Chapter 11, does not incorporate Section 524(e) . . . As

such, the rationale relied upon by Lowenschuss [that, in a Chapter 11 proceeding, § 524(e)

precludes bankruptcy courts from discharging the liabilities of nondebtors] does not apply in

Chapter 9 proceedings.").

The circumstance under which a municipal debtor may include a third-party release and

injunction in its plan of adjustment is a matter of first impression in the Ninth Circuit. In the two

recent municipal insolvencies of large California cities, Vallejo and Stockton, this relief was not

sought. In the Detroit chapter 9 case, Judge Rhodes held that § 524(e) is not a bar to a third-party

release or injunction in a chapter 9 case, but the proponent still must show that the injunction is

necessary or appropriate under § 105(a).

> A bankruptcy court's power to order a third party release is based on its power to
> reorder creditor-debtor relations needed to achieve a successful reorganization
> . . . [and] the release [must be] essential to reorganization [because] the
> reorganization hinges on the debtor being free from indirect suits against parties
> who would have indemnity or contribution claims against the debtor.

In re City of Detroit, Michigan, 524 B.R. 147, 266 (Bankr. E.D. Mich. 2014) (citations omitted).

Judge Rhodes explained that to gain approval of such a release, the debtor-city must show that the release of officers is "necessary to the [c]ity's efficient and effective functioning, to its revitalization, or the success of the plan." Id. The record of the Detroit chapter 9 case was devoid of any evidence substantiating the need, and the debtor's requested third party release was not approved. Id. at 297.

So too in the City of Vallejo chapter 9 case. See Deocampo v. Potts, 836 F.3d at 1134. In Deocampo, after confirmation of its plan of adjustment, the City of Vallejo, defending its officers in a district court action, attempted to shoehorn a third party release/injunction into its confirmed plan by arguing that the plan discharged claims against the officers along with claims against the city. The Ninth Circuit recognized that a third-party injunction is not precluded by the existing jurisprudence in the Ninth Circuit because § 524(e) does not apply in chapter 9, but found on the facts that the Vallejo plan did not discharge or enjoin claims against the officers.

The Deocampo court recognized that where an injunction is permissible, it at a minimum must be express and be supported by "specific factual findings." Id. at 1144; see also Rule 3016 ("If a plan provides for an injunction against conduct not otherwise enjoined under the Code, the plan and disclosure statement shall describe in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identify the entities that would be subject to the injunction."). The Vallejo plan did not expressly provide for such an injunction. Id. at 1144-45. There was no mention of an injunction of third-party claims. Id. Moreover, because the plan did not provide for an injunction there were no specific factual findings that such an injunction was necessary or appropriate to the plan of adjustment. Id. Finally, as noted by the court in City of Detroit, the proponent of a third party injunction must show "that the additional protection of a

third-party release is necessary to the City's efficient and effective functioning, to its revitalization, or to the success of its plan." Deocampo v. Potts, 836 F.3d at 1144 n.14 (citing In re City of Detroit, 524 B.R. at 265–67). The Vallejo confirmation order did not include a judicial finding that the third-party discharge or adjustment was an integral part of the reorganization. Id. at 1145.

Applying the considerations identified by the Deocampo court, an injunction may be permissible if (i) the injunction is express; (ii) the injunction is an integral part of the reorganization; and (iii) the injunction is supported by specific factual findings regarding the necessity of the injunction to the City's efficient and effective functioning, to its revitalization, or to the success of the plan. Id. at 1144 n.14. In this case, the Plan Injunction is necessary because the City cannot afford to pay the judgments of the Claimants against the Indemnified Parties and, absent the injunction, the City would be unable to provide municipal services in accordance with the annual budgets contemplated in the City's Financial Model, including not being able to implement the Police Resources Plan or make the payments required by the Plan.

(3) The Necessity for and Propriety of the Plan Injunction to the City's Plan Implementation

The first factor in the three-prong test is satisfied because the Plan Injunction was expressly set forth in the Plan, the Disclosure Statement and the applicable notices as required by the Federal Rules of Bankruptcy Procedure applicable to third-party injunctions. Rule 3016(c) provides that "[i]f a plan provides for an injunction against conduct not otherwise enjoined under the Code, the plan and disclosure statement shall describe in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and specify the entities that would be subject to the injunction." The City satisfied this rule because the Plan Injunction set forth in

18

Section XI.C of the Plan was printed in bold-faced type and specified the acts to be enjoined and the entities that would be subject to the injunction.

In addition, Rule 2002(c)(3), entitled "Notice of Hearing on Confirmation when Plan Provides for an Injunction," provides: "If a plan provides for an injunction against conduct not otherwise enjoined under the Code, the notice required under Rule 2002(b)(2) shall: (A) include in conspicuous language (bold, italic or underlined text) a statement that the plan proposes an injunction; (B) describe briefly the nature of the injunction; and (C) identify the entities that would be subject to the injunction." As reflected in the Confirmation Hearing Notice,[16] the City satisfied the requirements of Rule 2002(c) (3). The Confirmation Hearing Notice includes in bold text a statement that the Plan includes an injunction and describes that injunction. In addition the entities that are subject to the injunction are identified. Accordingly, the City complied with the requirements of the Federal Rules of Bankruptcy Procedure. Cf. Deocampo, 836 F.3d at 1144-46 (explaining Vallejo's chapter 9 plan did not contain any express third party injunction, and no notice of a third party injunction was provided). In contrast to Deocampo, the City complied with the detailed requirements of the Rules, gave notice to all creditors, and published notice so that any potentially affected creditors would have notice and the opportunity to be heard. There is no question that the City made the Plan Injunction a linchpin of the Plan and the effect of the Plan Injunction was highly publicized. Accordingly, this first factor is satisfied.

The second and third factors are also satisfied. The circumstances surrounding the City's slide into insolvency are described in the prior opinions of this Court. See Eligibility Opinion, 499 B.R. at 778-79. In summary, the Great Recession and the burst of the housing bubble in 2007 negatively affected the City like many other cities in California and the entire country. The

---

[16] ECF No. 1884, filed July 29, 2016.

drop in housing prices and increase in foreclosures of single family residences resulted in significantly lower property tax revenues, a prime source of revenue for California cities. The City was particularly hard hit by these phenomena because, due to the cheaper housing and available financing, an influx of people moved to the Inland Empire during the boom, and the consequent bust led to unprecedented foreclosures – one of the highest rates in the country. Along with the foreclosures came substantial unemployment, as much of the population had been employed in the housing industry, from construction workers to realtors to mortgage brokers, resulting in a significant drop in household income. This decline led to less consumer sales and consequently smaller sales tax revenues, another major component of the City's revenues.

The City's unemployment rate was 16.9% as of June 2012, more than double the national rate of 8.2%. The City was impacted not only on the revenue side but also by escalating expenses. The influx of population created a greater demand for public services, from public safety (police and fire) to more mundane matters such as street repair and infrastructure maintenance. As the economy worsened and revenues decreased, the City took some stop gap measures to try to stop the bleeding. It implemented a hiring freeze and down-sized departments, reducing the workforce by 20%. It negotiated and imposed concessions on its unions, saving about $10 million per year. It exhausted its general fund reserves and sold excess assets to provide cash to fund ongoing operations.

In May 2012, the then new Director of Finance, Jason Simpson, began analyzing the City's financial condition, while attempting to formulate a budget for 2012-13. In doing so, Simpson determined that the budget projection for 2012-13 resulted in a $45.9 million cash deficit with no general fund reserves; the cash balances for the prior two fiscal years had been overstated; the beginning cash deficit for the next fiscal year was over $18.2 million; and the

City did not have enough unrestricted cash or reserves to pay its current financial obligations, those obligations to become due beginning in July 2012, and continuing indefinitely. Id. at 780; see also San Bernardino City Professional Firefighters Local 891 v. City of San Bernardino, California (In re City of San Bernardino, California), 530 B.R. 474, 477 (C.D. Cal. 2015)("The City's financial situation deteriorated quickly in the summer of 2012. The City ran out of cash to pay its creditors and employees, and had a projected budget deficit of $45.8 million. Personnel costs alone were projected to exceed all of the City's General Fund revenue.").

During the pendency of the Chapter 9, as described above, the City dramatically reduced expenses and worked diligently to increase revenues. Yet, per the declaration testimony and attached exhibits of Mr. Busch, if the City were to move forward without restructuring its debts through the Plan, the City would still operate at a deficit of nearly $4 million beginning in fiscal year 2018-19, and this operating deficit would increase each year to a peak of nearly $20.5 million in fiscal year 2025-26. Thus, the City must restructure its debts through the Plan in order to continue as a viable municipality and provide basic essential services to the City's residents. By contrast, with the restructuring and fiscal and service stabilization components of the Financial Model, the City will be a viable municipal service provider for its residents.

The record before the Court demonstrates that the City must allocate its very limited resources to providing municipal services to its residents and rehabilitating the City's vital infrastructure. Even given the 1% payment of claims under the Plan, including on Litigation Claims against the City and the Indemnified Parties, the City cannot afford to fully fund the

21

City's critical needs. The unrefuted testimony of Mr. Busch and current City Manager Mark Scott[17] substantiated this reality.

Public safety is a major concern of the City. The declaration testimony of Police Chief Burguan shows that the City's high violent crime rates exceed state and national averages. In 2015, the City, led by Chief Burguan, prepared the Police Services Five Year Resources Plan ("Police Resources Plan"), which was approved at a regularly noticed public meeting of the Mayor and Common Council on November 16, 2015. The Police Resources Plan as proposed and adopted by the Mayor and Common Council requires additional funds of $56.5 million over five years to implement.

Chief Burguan's testimony also demonstrated that during the bankruptcy case, crime further increased in the City. As of June 2016, there have been significant increases in the number of violent crimes over 2015, such as criminal homicide (a 100% increase), forcible rape (a 15.56% increase) and aggravated assault (a 17.96% increase). There were 50 homicides in San Bernardino in 2016 as of September 27, which is more than the total number of homicides for all of 2015. The City has a significantly higher homicide rate this year per 100,000 residents than Chicago or Oakland.

Under the Financial Model, only approximately 15% of the funds needed are allocated for infrastructure repair and maintenance, and the City can afford just 40% of what is necessary to fund the critical needs identified in the Police Resources Plan. That 40% allocation is sufficient for the City to provide basic essential services to its residents, but the City will not be able to afford much beyond those basic services. The City's critical need for funding police services will not be fully addressed in the foreseeable future. If the City is required to pay more

---

[17] Decl. of Mark Scott, September 30, 2016, ECF No. 1988.

than 1% under the Plan, the City would be required to further reduce funding for the Police

Resources Plan and infrastructure repair and maintenance. Mr. Scott testified, consistent with Dr.

McCrary's[18] expert testimony, that decreasing funding for the Police Resources Plan would

result in an increase in violent crime, less services to City residents, even greater challenges to

attracting businesses, and the impairment of economic growth and investment in the City. Under

those circumstances, and given the realities of the City's indemnification obligations, it is

necessary and appropriate to enjoin the holders of Litigation Claims against Indemnified Parties

from recovering from City employees personally for harms that occurred within the scope of

employment.

In addition, the City's police officers and other employees are contributing an indirect

economic benefit to the adjustment of debts under the Plan. The City's police officers and other

employees agreed to the City's modified terms and conditions of employment under their new

collective bargaining agreements and as part of that process agreed to a 1% distribution on their

claims, which claims have been valued at $130 million. The police officers alone agreed to a 1%

distribution on their claims valued by the parties at $74 million, principally claims for reduction

of pension and retiree health benefits. The employees had credible arguments under state law

regarding the legality of the modifications of the benefits, the litigation of which would certainly

have dramatically disrupted the City's momentum toward a substantially consensual plan.

Moreover, had the police officers prevailed in any such litigation, the resulting inability of the

City to impair up to $130 million of claims would have stopped the City's reorganization dead in

---

[18] Dr. McCrary is an economist retained by the City to provide expert testimony regarding the impact of the City's financial crisis on the Police Department and provision of police services to the residents. The Court finds Dr. McCrary well-qualified to opine on the impact of underfunding the Police Resources Plan.

its tracks. The police officers and other City employees made a substantial financial contribution to the reorganization in agreeing that their unsecured claims could be paid in the 1% class.

Another factor in favor of approving the Plan Injunction is that the Plan Injunction is narrowly tailored. First, at the request of certain Claimants, the City revised the Plan Injunction to clarify that claims against Indemnified Parties can be litigated and can proceed to judgment.[19] Only collection of those judgments will be enjoined, and only to the extent of the City's indemnification obligation. The plaintiffs will still be able to recover from any available insurance. If not satisfied with applicable insurance, claims against employees that are indemnified by the City (the Indemnified Parties) will be satisfied as General Unsecured Class 13 Claims under the Plan. The Plan Injunction is narrowly tailored to achieve the specific purposes of the Plan, namely that the City can operate after the Confirmation Date in accordance with the Financial Model and provide basic municipal service to its residents.

A final factor but critical factor that the Court weighed in favor of approving the Plan Injunction was the settlement achieved by the City and BICEP,[20] which settlement kept in place the excess liability coverage provided for in the BICEP Agreements even though the City will pay the self-insured retention ("SIR") in accordance with the treatment of Class 13 claims under the Plan. Thus, for the Litigation Claims allowed in an amount in excess of the $1 million SIR under the BICEP Agreements, the City will utilize the coverage available under the BICEP Agreements to pay the portion of the claim in excess of $1 million. For Claimants with allowed

---

[19] As noted above, the City modified the Plan to add Section XI.G on September 30, 2016.

[20] ECF No. 2096.

claims based on catastrophic injuries, the BICEP excess coverage may provide substantial monetary recourse.[21]

(4) The Anti-Injunction Act and <u>Law v. Siegel</u> do not Prohibit the Injunction.

The Anti-Injunction Act, 28 U.S.C. § 2283, provides that "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." The Act prohibits courts of the United State from enjoining state court proceedings[22] except in three circumstances: (i) if expressly authorized by an Act of Congress, or (ii) where necessary in aid of its jurisdiction, or (iii) to protect or effectuate its judgment. Section 105(a) is an expressly authorized exception to the Anti-Injunction Act as shown by the legislative history and case law. <u>Huse v. Huse–Sporsem (In re Birting Fisheries, Inc.)</u>, 300 B.R. 489, 497 n.7 (9th Cir. BAP 2003); H.R.Rep. No. 95–959, 95th Cong., 1st Sess., at 316–17 (1977), reprinted in, 1978 U.S.C.C.A.N. 5787, 5815 (stating that § 105 is "an authorization, as required under 28 U.S.C. 2283, for a court of the United States to stay the action of a State court");  H.R.Rep. No. 95–959, 95th Cong., 1st Sess., at 316–17 (1977), reprinted in, 1978 U.S.C.C.A.N. 5787, 5815 (stating that § 105 is "an authorization, as required under 28 U.S.C. 2283, for a court of the United States to stay the action of a State court").

---

[21] The dispute between the City and BICEP was presented to the Court in a Motion to Assume Executory Contract filed by the City and opposed by BICEP. Several Civil Rights Claimants joined in the City's motion, recognizing the potential benefit to the Claimants. The settlement achieved by the City through mediation with BICEP exceeded the relief the court could have granted, even if the City had prevailed on its Motion. In particular, BICEP's recognition that the City could satisfy the SIR with Plan 1% dollars was a significant benefit to any Claimant with an allowed claim in excess of one million dollars.

[22] In other contexts, courts have held that bankruptcy courts are not "courts of the United States," so the Anti-Injunction Act may not apply at all to this proceeding. See  Perroton v. Gray (In re Perroton), 958 F.2d 889, 891 (9th Cir. 1992);  In re G.S.F. Corp., 938 F.2d 1467, 1478 (1st Cir. 1991). In addition, the majority of the civil right cases are brought in federal, not state courts.

In addition to the authority of § 105, the Plan is a necessary aid to this Court's jurisdiction to confirm an effective and feasible plan which will lead to an adjustment of the City's debt. Therefore, the Anti-Injunction Act does not create a ban to the Plan Injunction.

The ruling in <u>Law v. Siegel</u> is also inapplicable to the Plan Injunction. In <u>Law v. Siegel</u>, the Supreme Court held that a bankruptcy court may not enter an order under § 105(a) to circumvent or "override explicit mandates of other sections of the Bankruptcy Code." 134 S.Ct at 1194. The mandate referred to by the Court was § 522(k), which expressly prohibited surcharge of an exemption to pay administrative expenses, the exact relief Trustee Siegel received against Law's homestead exemption. There is no similar "explicit mandate" of the Code which prohibits third party injunctive relief. Section 524(e) does not apply in a Chapter 9 and no other section of the code addresses this type of relief. <u>See</u> <u>Deocampo v. Potts</u>, 836 F.3d at 1143. Because the Plan Injunction does not circumvent any other applicable part of the Code, <u>Law v. Siegel</u> does not compel the prohibition of such injunction.

### III. CONCLUSION

The confirmation of the Plan provides the most hopeful outlook for this financially struggling City to turn around its fiscal crisis, provide sufficient municipal services to its residents, and make the streets safe for economic development and greater personal prosperity. The Plan Injunction is a needed and necessary tool for the success of the Plan and the revitalization of San Bernardino. For that reason, and all those stated above, it is approved as part of the Plan.

Date: March 7, 2017

Meredith A. Jury
United States Bankruptcy Judge